In re WINSTAR COMMUNICATIONS,
INC. et al., Debtors.

Christine C. Shubert, Chapter
7 Trustee, Plaintiff,

v.

Lucent Technologies Inc., Defendant.

Bankruptcy No. 01–1430 (JBR).
Adversary No. 01–1063 (JBR).

United States Bankruptcy Court,
D. Delaware.

Dec. 21, 2005.

Stephen M. Rathkopf, Herrick, Feinstein, LLP, New York City, David R. King, Herrick, Feinstein, LLP, Princeton, NJ, for Christine C. Shubert.

Paul C. Sanders, Daniel Slifkin, Michael A. Paskin, Cravath, Swaine & Moore, LLP, New York City, Daniel J. DeFranceschi, Rebecca L. Booth, Jason J. Madron, Richards, Layton & Finger, PA, Wilmington, DE, for Lucent Technologies, Inc.

**MEMORANDUM OF DECISION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO COUNTS VII, X, AND XI OF THE SECOND AMENDED COMPLAINT AND COUNTS 5 AND 6 OF THE SECOND AMENDED ANSWER AND COUNTERCLAIMS**

JOEL B. ROSENTHAL, Bankruptcy Judge.

■ This matter came before the Court for trial on Counts VII (breach of subcontract),[1] X (preference), and XI (equitable subordination) of the Second Amended

---

1. The parties agree that the alleged breach is a breach of the Agreement for Network Build-out Services (the "Subcontract") and not a breach of any funding obligation under the credit facilities. *See* Joint Pretrial Memorandum [Adversary Proceeding Docket (hereinafter "Docket") # 292] at Exhibit 12.

**242**

Complaint [2] and one count of fraud (Count 5) and one count of negligent misrepresentation (Count 6) of the Second Amended Answer and Counterclaims.[3] As set forth in greater detail below, the Court finds that these matters are core proceedings in which the Court may enter final orders, or with respect to Lucent's counterclaims, even if they are related to non-core proceedings, Lucent has consented to the entry of final orders.

In reaching its determinations, the Court considered the entire 21 days of testimony given by 39 witnesses, considered the demeanor and credibility of the 13 witnesses who testified in person [4] and, to the extent possible the demeanor and credibility of the 16 witnesses whose videotaped testimony was introduced,[5] considered the credibility of the witnesses whose testimony was read into the record, reviewed the over 1400 exhibits (including many duplicates) totaling many thousands of pages admitted in evidence, heard arguments of counsel, and reviewed the various pre– and post-trial pleadings submitted in support of each party's position. The fol-

2. On May 29 and August 7, 2003, the Bankruptcy Court, on Lucent's motion, entered orders dismissing Count IX (breach of covenant of good faith and fair dealing), precluding the Trustee from recovering consequential or punitive damages on any of her claims, and prohibiting the Trustee from obtaining any affirmative monetary recovery on her equitable subordination claim [Docket ## 85, 103]. The Trustee, with Lucent's assent, voluntarily dismissed Counts I through VI and Count VIII [Docket # 207].

3. Count 2 of the Second Amended Answer and Counterclaims is a count for setoff pursuant to 11 U.S.C. § 553. The parties have stipulated that in the event the Trustee is awarded judgment against the Defendant under the Subcontract, the Defendant is entitled to a total setoff of $6.3 million. (Stipulation By and Between The Trustee and Lucent. Technologies Inc. Concerning Lucent's Counterclaim for Setoff at ¶ 1 [Docket # 337] ). Counterclaim 3 is a claim for fraud and counterclaim 4 is one for negligent misrepresentation. Both are based on Winstar's alleged representations to Lucent during Lucent's "due diligence" investigation in November and December 2000. Neither of these counterclaims were raised by Lucent in the Joint Pretrial Memorandum as required by paragraph 7(H) and (I) of the Court's Pretrial Order of January 26, 2005 [Docket # 275] ("The parties are ordered to file ... a Joint Pretrial Memorandum approved by all counsel and unrepresented parties, which shall set forth the following: ... (H) The issues of fact which remain to be litigated (evidence at trial shall be limited to these issues); (I) The issues of law to be determined....") and thus are deemed waived. Had they not been waived, the credible evidence supports a finding that Lucent did not carry its burden of proof as it had sufficient knowledge of the financial condition of Winstar during the relevant period that it could not have reasonably relied upon any allegedly misleading information. Lucent's surviving counterclaims for fraud and negligent misrepresentation relate to the breach of the so-called CAPEX covenant.

4. The witnesses who testified at trial were Paul Pocalyko, Stephen Scherf, Martina Hunt–Majean, Mark Wilson, Reginald Kipke, Kevin Collins, Christopher Stark, Michael Keefe, Elizabeth Perricone (some of Perricone's testimony also came in via portions of deposition testimony read at trial), Gregory Garrett, Henry Schacht (some of Schacht's testimony also came in via videotaped deposition testimony played at trial), Vernon Terrill, and John Solomon.

5. The witnesses whose testimony was admitted via videotaped depositions were Nathan Kantor, Lisa Hicks, William Zlotnick, Jill Diroma, Frederic Rubin, David Ackerman, Richard McGinn (some of McGinn's testimony also came in via portions of deposition testimony read at trial), William Rouhana, Michael Montemarano, Deborah Hopkins, Gary Simpson, William Fullerton, Richard Uhl, Kevin Monaco (some of Monaco's testimony also came in via portions of deposition testimony read at trial), Gary Goldman, and Kevin Howell. As noted above some of Schacht's testimony was introduced on videotape; the Court also had the opportunity to observe this witness when he testified in person later during the trial.

lowing decision constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052, and as set forth below, to the extent that the district court concludes that this Court may only enter proposed finding and rulings pursuant to Fed. R. Bank. P. 9033 with respect to some or all of the counts or counterclaims, the following constitutes the Court's proposed findings and rulings with respect to such counts or counterclaims.

**EXPLANATION OF CITATIONS**

The parties have stipulated to certain facts as most recently set forth in the Revised Joint Stipulation of Uncontested Facts (the "Revised Joint Stipulation"), attached as Exhibit A to the Renumbered Joint Stipulation of Uncontested Facts [Docket # 331].

Citations to trial exhibits introduced by the Plaintiff are cited as "PX # "; Defendant's trial exhibits are cited as "DX # ." In many instances the parties introduced the same document or portions of the same document. The Court generally has cited to duplicate documents by only one exhibit number. Citations to specific pages within a multiple-page exhibit are cited by exhibit number and Bates number or by page number if the exhibit does not contain Bates numbers.

**6.** In many instances non-consecutive portions of videotaped testimony were introduced, In designating the corresponding transcripts, the parties, for some but not all of these witnesses, renumbered the pages sequentially and kept the reference to the original volume and page. In some instances while the renumbered pages introduced as a witness' direct testimony begin with page 1, so do the first pages of the witness' cross examination and redirect testimony. The Court will refer to the renumbered page designation as "direct," "cross" or "redirect" when necessary and omit reference to the original volume and page numbers unless such additional citation is necessary to avoid confusion.

Citations to testimony in the trial transcripts (which include only testimony from witnesses who were physically present in court and deposition testimony read into the record) identify the witness, followed by the designation "Depo" in instances where the deposition testimony was read into the record, and "Tr." along with reference to the transcript volume, the page and, where needed, line numbers. The trial transcripts appear on the docket at numbers 322–326, 338, and 351–356.

Citations to transcripts of videotaped deposition testimony (which was played during trial but not transcribed as part of the trial transcript) contain the designation "Video" and identify the witness; if necessary, whether the testimony is designated as "Direct," "Cross" or "Redirect," [6] the page and line numbers of the transcribed deposition testimony. The transcripts of the videotaped depositions or portions thereof that were introduced at trial were admitted as exhibits and are listed in the Stipulated Joint Trial Exhibits [Docket # 335].

**JURISDICTION**

1. In order to understand the Court's conclusions with respect to its jurisdiction to enter final orders,[7] it is necessary to explore Lucent's objection to this Court's entry of a final order. On April 18, 2001

**7.** Whether the Court treats its order as final under Fed. R. Bankr.P. 7052 or proposes findings and rulings to the district court under Fed. R. Bank. P. 9033 will affect the way in which the parties respond to the orders issued contemporaneously herewith. Moreover "a proceeding's core or non-core nature is crucial in bankruptcy cases because it defines both the extent of the Bankruptcy Court's jurisdiction, and the standard by which the District Court reviews its factual findings." *Halper v. Halper,* 164 F.3d 830, 836 (3d Cir.1999). *Compare* Fed. R. Bankr.P. 9033(d) *with* Fed.R.Bankr.P. 8013.

(the "Petition Date") Wireless Communications, Inc. ("Winstar") and Winstar Wireless, Inc. ("Wireless" and collectively with Winstar, the "Debtors") filed voluntary petitions for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code. (Revised Joint Stipulation, ¶ 3). In January 2002 the cases were converted to Chapter 7 and shortly thereafter Christine C. Shubert (the "Trustee") was appointed as the Chapter 7 trustee. (*Id.*, ¶¶ 3 and 4).

2. This adversary proceeding was commenced by the Debtors on the Petition Date. In July 2002 the Trustee stepped in as the Plaintiff and soon thereafter filed her Second Amended Complaint and Jury Demand ("Second Amended Complaint") [Docket # 69], the operative complaint in this case. As the caption of the Second Amended Complaint suggests, the Trustee requested a jury trial on all actions that could be tried to a jury. In the Second Amended Answer and Counterclaim of Defendant Lucent Technologies Inc. ("Lucent") to the Second Amended Complaint ("Second Amended Answer"), dated March 24, 2004 [Docket # 156], Lucent also demanded a jury trial "on all issues properly triable thereby." Subsequently the Trustee withdrew her request for a jury trial.[8] The Trustee alleged that these proceedings are core; Lucent disagreed except with respect to the preference action. (Second Amended Complaint at ¶ 3; Second Amended Answer at ¶ 3).

3. In June 2004 Lucent sought discretionary withdrawal of the reference pursuant to 28 U.S.C. § 157(d) in the district court and a waiver of Local Bankruptcy Court Rule 5011–1 as it did not file a contemporaneous motion asking the Bankruptcy Court to determine whether these matters were core or non-core [Docket # 208].[9] In July 2004 Lucent filed a memorandum in support of its withdrawal motion [Docket # 237] and urged withdrawal of the reference on the grounds that Lucent was entitled to a jury trial on the Trustee's preference and breach of contract claims and on its own fraud and negligent misrepresentation counterclaims. The Bankruptcy Court then stayed its proceedings pending the district court's determination of the withdrawal motion.

4. In November 2004 the district court entered its Memorandum Opinion and Order [District Court Docket ## 11 and 12] denying the withdrawal motion. Specifically the district court concluded that Lucent had waived its right to a jury trial by the filing of its proofs of claim and that Lucent did not meet the standards for a permissive withdrawal of the reference for "cause" under *In re Pruitt*, 910 F.2d 1160, 1168 (3d Cir.1990).

5. From before the filing of the withdrawal motion, through the conclusion of the Trustee's case-in-chief in this Court when Lucent then unsuccessfully sought judgment on partial findings pursuant to Fed. R. Bank. P. 7052, until after submission of all the evidence, and indeed, submission of each party's proposed findings of fact and conclusions of law in this adver-

---

8. The district court concluded that the Trustee had the right to withdraw her jury demand without Lucent's consent. Memorandum Opinion, dated November 16, 2004, at 7 entered in *Shubert v. Lucent Technologies, Inc.*, United States District Court for the District of Delaware Civil Action 04–928 [District Court Docket # 8].

9. Contemporaneously with the filing of the withdrawal motion, Lucent filed a Motion for Summary Judgment [Docket # 210] seeking judgment from the Bankruptcy court on all three remaining counts. The motion is silent with respect to any objection to the entry of final orders.

sary proceeding.[10] Lucent did not raise the issue that the Bankruptcy Court lacked jurisdiction to enter final judgment. In fact the record is clear: Lucent sought a final order in its favor on several occasions from this Court.[11]

6. On the evening of June 9, 2005, Lucent filed a letter, dated June 8, 2005 [Docket #343], "remind[ing] the Court that Lucent has not consented to the Court's jurisdiction to issue final orders or judgments with respect to non-core proceedings in this matter." In the letter Lucent identified the Trustee's breach of the subcontract claim and Lucent's fraud and negligent misrepresentation counterclaims as non-core. Although the June 8, 2005 letter cites to Lucent's Second Amended Answer and Counterclaims to Second Amended Complaint in support of its position that it has not consented to the entry of final orders by this Court, its failure to mention the withdrawal motion or the district court's ruling is striking and perhaps intentionally deceptive.[12]

7. At closing argument Lucent maintained that the district court's decision did not address the core/non-core issue but only whether Lucent was entitled to a jury trial. Although the district court plainly concluded that the matters on which Lucent claimed a jury trial were triable only in equity, the district court concluded that Lucent's filing of its proofs of claim triggered the claims allowance process.[13] The

---

**10.** The last day on which evidence was submitted was May 11, 2005. Both parties rested at that time. Lucent electronically filed its proposed findings of fact and conclusions of law on June 6, 2005 at 11:32 p.m. Closing arguments, which of course are not evidence, occurred on June 13, 2005.

**11.** Lucent sought summary judgment on Trustee's preference and breach of contract claims as well as its own claims for fraud and negligent misrepresentation in June 2004. There is nothing in the pleadings to suggest Lucent was asking the Court to provide proposed findings and conclusions to the district court. In the Pretrial Memorandum, the parties were unable to agree as to the legal issues to be decided so each party set forth its position. Nowhere in Lucent's detailed 12 page statement of the legal issues, or indeed anywhere else in the Pretrial Memorandum, does Lucent allege the Court lacked jurisdiction to enter final orders. At the conclusion of the Trustee's case in chief, Lucent orally and in writing sought judgment pursuant to Fed. R. Bank. P. 7052 and again did not raise an objection to this Court's entering a final order. Similarly Lucent's proposed findings and conclusions do not suggest that there is an ongoing dispute as to whether these proceedings fall outside the core jurisdiction of the Court.

**12.** The Court views the statement in the same June 8, 2005 letter that "[t]his court has never

decided whether these claims are core or non-core" as another example of counsel's attempt to mislead this Court. The statement, although technically correct, was occasioned by Lucent's own behavior. As the district court noted, one of the grounds for denying the withdrawal motion was Lucent's failure to follow Local Bankruptcy Rule 5011–1 which required that Lucent file a motion seeking a determination by the Bankruptcy Court as to whether these counts and counterclaims were core or not. Moreover, as discussed herein, whether this Court views the claim and counterclaims as core or non-core is largely irrelevant because, contrary to Lucent's argument, the district court has definitively spoken on this issue when it found that the claims and counterclaims were part of the claims allowance process and when it refused to find, as Lucent had urged, that the claims and counterclaims were independent of the proofs of claim.

**13.** "[T]he Court finds that the Trustee's subsequent preference action is now part of the claims allowance process, and is triable only in equity." Memorandum Opinion at 6–7. "The Court is not persuaded by Lucent's argument that the determination of its proofs of claim does not depend on the outcome of the Trustee's Subcontract Claim. The Court finds that the Trustee's Subcontract Claim may affect the ordering of creditors or the equitable distribution of the res of the estate and, thus, are now part of the claims allowance process,

"allowance or disallowance of claims against the estate" is one of the specifically enumerated types of actions which fall within the express definition of a core proceeding. 28 U.S.C. § 157(b)(2)(B).

8. Following the district court's decision, Lucent filed a motion seeking certification of the district court's order pursuant to 28 U.S.C. § 1292. That motion was pending in the district court when this case was being tried before the Court. Subsequently the district court denied the motion.[14] The district court stated that this Court "has not determined whether this matter is a core or non-core proceeding." (Memorandum Order [District Court Docket # 21] at p. 3).

■ 9. The Court, however, interprets the district court's earlier findings that the claims and counterclaims fall within the claims allowance process to necessitate a finding that these actions are core pursuant to 28 U.S.C. § 157(b)(2)(B). While fully cognizant of this Court's role in following the findings and conclusions of the district court with respect to jurisdiction in this case, lest Lucent continue to espouse the position that whether these proceedings fall within the core jurisdiction of the Bankruptcy Court remains an open issue, this Court seeks to be clear: even if the district court did not intend its use of the phrase "claims allowance process" to be read as synonymous with the language of section 157(b)(2)(B), the Court's independent examination of its own jurisdiction would lead to the same conclusion, namely, the counts decided herein are core pursuant to 28 U.S.C. § 157(b)(2)(B). Although the counterclaims for fraud and misrepresentation could be classified as non-core related to actions, Lucent has given its implicit consent to the entry of final orders on those counterclaims. The rationale for these findings is set forth below.

■ 10. As set forth in greater detail below, in 1998 Lucent and Winstar entered into a Credit Agreement (the "First Credit Agreement") (DX 96) whereby Lucent was the primary secured lender to Winstar, and a Supply Agreement (PX 123) whereby Lucent was to provide Winstar with a turnkey buildout of its global communications network. Because Lucent was unable or unwilling to perform the buildout, it subcontracted services to Wireless under the Network Agreement for Buildout Services (the "Subcontract") (DX 177). The expectation was that Lucent would, in time, assume all of its obligations under the Supply Agreement. Accordingly, the Supply Agreement contemplated that Lucent would "develop a transition plan with Winstar's input, review and potential approval" scheduling Lucent's assumption of the various aspects of the buildout. (PX 123 at Schedule A ¶ 3.3(a); see also PX 123 at ¶ 6.1 and ¶ 6.5). Although all obligations under the First Credit Agreement

triable only in equity." *Id.* at 7–8. "The Court finds that Lucent's Fraud and Negligent Misrepresentation counterclaims involve a decision regarding distribution of the bankruptcy estate and, thus, are now part of the claims allowance process, triable only in equity." *Id.* at 8.

14. Throughout the course of this case and indeed, after closing arguments, the parties sent a flurry of letters to the Court. Many of them were little more than recitations of the squabbling between the parties regarding alleged misstatements of facts. Ultimately the Court issued an order cautioning the parties that it would not tolerate such behavior [Docket # 350]. Given the district court's Memorandum Order, however, the Court would have expected the parties to file some type of notice advising this court of the district court's decision. Neither parties, however, informed the Court of the district court's decision and order. The Court only discovered the Memorandum Order when it checked the district court docket as it was about to issue these findings and rulings.

were fully paid in 2000, the First Credit Agreement was replaced by a Second Credit Agreement (DX 29). The anticipated Transition Plan never came to fruition [15] and thus the parties continued to operate under the Supply Agreement and Subcontract.

11. In October 2001 Lucent filed a proof of claim (the "Proof of Claim") (PX 340) which, on its face, states Lucent held a secured claim (and to the extent not secured, an unsecured claim) in "[a]n amount not less than $138,957,218.90" for "goods sold," "money loaned," and "other." In the "Summary of Supporting Documentation" attached as Tab A.2 to the Proof of Claim, Lucent described the documents which support its claim as the "Supply Agreement . . ., any amendments thereto and *any and all related documents, agreements and statements of work.*" (Emphasis added). The Subcontract is certainly an agreement related to the Supply Agreement; it is the means by which Lucent was to fulfill its obligation to perform the network buildout. In addition, although the parties do not define a "statement of work," its plain meaning suggests it is nothing more than a description or list of work performed. The March 2001 "spreadsheet," [16] against which Lucent refused to pay, is a breakdown of the services performed. (PX 245). Thus this spreadsheet appears to qualify as a statement of work. Whether Lucent may have breached the Subcontract by refusing to pay the March 2001 spreadsheet has a direct bearing upon whether Lucent may recover under its Proof of Claim and if so,

in what amount. Therefore the breach of the Subcontract claim falls within the core jurisdiction of the Court. 28 U.S.C. § 157(b)(2)(B). *Southeastern Sprinkler Co., Inc. v. Meyertech Corp. (In re Meyertech Corp.),* 831 F.2d 410, 418 (3d Cir.1987)(creditor's filing a proof of claim on a pre-petition breach of contract action created an action in bankruptcy court that "[b]y its very nature [ ] fits directly under the more specific definition of a core proceeding under § 157(b)(2)(B) . . . ."). *See also S.G. Phillips Constructors, Inc. v. City of Burlington, Vermont (In re S.G. Phillips Constructors, Inc.),* 45 F.3d 702 (2d Cir.1995)(filing a proof of claim converts a pre-petition state law claim into a core proceeding); *In re NDEP Corp.,* 203 B.R. 905, 910 (D.Del.1996).

12. The Court is cognizant of the fact the Proof of Claim was filed after the original complaint in this matter. That fact is insufficient to render the above case distinguishable and the breach of contract claim non-core. Although older cases often cite what has been described as "a firmly established rule that subject matter jurisdiction is tested as of the time of the filing of the complaint," *Rosa v. Resolution Trust Corporation,* 938 F.2d 383, 392 n. 12 (3d Cir.), *cert. denied* 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991), the Third Circuit has recognized that the rule is not to be applied blindly.

The principle that jurisdiction is determined at the outset of the action is simply insufficient to support the con-

---

**15.** The Supply Agreement defines the Transition Plan as "the plan specified in Schedule A regarding Lucent's time periods to begin providing certain of the Services as specified in the plan." (PX 123 ¶ 1.1(qq)). Schedule A, titled "Statement of Work," describes Lucent's anticipated role in designing, building, and managing the network. Exhibit A–4 is titled "Initial Transition Plan." The Initial Transition Plan is not the "Transition Plan" which the parties agree never came to be.

**16.** The Court uses the term "spreadsheet" because this is a term used by the parties to describe this document. What the document is or should be deemed to be is the matter of some discussion, *infra.*

tinuing applicability of [12 U.S.C.] § 1441a(*l*)(1) to this case. One basic difficulty with this argument is that the letter and spirit of the rule apply most clearly to diversity cases. The Supreme Court set out the rule in the diversity context. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 286, 290–92, 58 S.Ct. 586, 590, 591–92, 82 L.Ed. 845 (1938). In addition, the Court crafted the rule for the removal of actions from state court, which involves a more lenient standard not relevant here. *Id.* Most importantly, the policies behind removal and the risks of manipulative behavior played a significant role in the Court's decision. St. Paul focused primarily on the monetary threshold for federal jurisdiction, observing that the time of filing rule prevented plaintiffs from subsequently amending their complaint to plead a lesser amount and avoid removal. *Id.* at 294, 58 S.Ct. at 592–93. Similar concerns applied to changes of parties that would potentially destroy diversity of citizenship. *Id.* at 294–95, 58 S.Ct. at 592–93. From the outset, the underlying concern of the time of filing rule was the risk that parties would deploy procedural tactics to manipulate federal jurisdiction.

The rule that jurisdiction is assessed at the time of the filing of the complaint has been applied only rarely to federal question cases. Moreover, in these rare cases, the rule has often been applied axiomatically, without extensive discussion or analysis. *See Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 392 n. 12 (3d Cir.), *cert. denied*, 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991); *see also F. Alderete General Contractors, Inc. v. United States*, 715 F.2d 1476, 1480 (Fed.Cir.1983) (observing in government contracts action that "the decision below is at variance with the long-standing rule in the Federal courts that

jurisdiction is determined at the time the suit is filed and, after vesting, cannot be ousted by subsequent events, including action by the parties"). Even in the federal question context, however, the focus of the time of filing rule has been on preventing manipulation of jurisdiction when a claim is removed. As we observed in *Westmoreland Hospital Ass'n v. Blue Cross of Western Pa.*, "a subsequent amendment to the complaint after removal designed to eliminate the federal claim will not defeat federal jurisdiction." 605 F.2d 119, 123 (3d Cir. 1979) (emphasis added), *cert. denied*, 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980). Along with the obvious goal of judicial efficiency, we perceive the risk of strategic behavior as the primary rationale behind the time of filing rule.

Manipulation of jurisdiction is simply not at issue in this case. There is no suggestion of manipulation, nor would the facts support it. The jurisdiction-destroying transfer of assets between the RTC and New Rock was an arms length transaction independent of the jurisdictional issue. Without the possibility of manipulative behavior, the primary policy behind the time of filing rule is not implicated.

Our rejection of an absolute time of filing requirement breaks no new ground. Courts that have considered the rule more fully have not hesitated to abandon it where appropriate. In *Boelens v. Redman Homes, Inc.*, 759 F.2d 504 (5th Cir.1985), the Fifth Circuit discussed the policies behind the time of filing rule and held that in a federal question case, where the plaintiff's amended complaint omitted federal counts included in the original complaint on which jurisdiction could be based, the court would look to the amended complaint and decline jurisdiction. *Id.* at

508. The Fifth Circuit interpreted this rule as consistent with the general principle that the amended complaint "supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading." *Id.* at 508.

We were equally quick to reject the time of filing rule in *Lovell Mfg. v. Export–Import Bank,* 843 F.2d 725 (3d Cir. 1988):

> *Lovell* . . . cites several older Third Circuit cases for the proposition that our determination of jurisdiction should be based solely on the basis of the pleadings, and not on subsequent events. . . . We are uncertain that these cases stand for the broad proposition for which *Lovell* cites them. However, regardless of what they once might have stood for, and regardless of the merit of these principles elsewhere, plainly they do not reflect recent Third Circuit jurisprudence. As *Lovell* itself concedes, later cases clearly hold that once all federal claims have been dropped from a case, the case simply does not belong in federal court.

*Id.* at 734 (citations omitted). We concluded by observing "that to the extent a black-letter rule ever existed, precluding a court from relying on post-removal events . . ., the Supreme Court clearly did not feel bound by it in *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)." *Id.* at 735. Although the time of filing rule certainly retains a large measure of persuasive efficacy, we read *Lovell* as a clear rejection of any iron-clad time of filing requirement. *Cf. Carr v. Ameri-*

*can Red Cross,* 17 F.3d 671, 683–84 (3d Cir.1994) (federal jurisdiction arising from the involvement of the American Red Cross in a case will cease on the dismissal of the Red Cross from the case).

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.,* 101 F.3d 1492, 1503–04 (3d Cir.1996).

13. In this case the operative complaint, the Second Amended Complaint, was filed after the filing of Lucent's Proof of Claim. Moreover, this case does not involve the issue of destroying jurisdiction by subsequent events nor is there any suggestion that the Trustee attempted to manipulate jurisdiction.

14. In its Second Amended Answer, Lucent admitted that the preference action is a core matter but disputed that all other counts were core. (Second Amended Answer at ¶ 3). This denial would include the count for equitable subordination. "Equitable subordination is unquestionably a 'core' proceeding pursuant to section 157(b)(2)." *In re M. Paolella & Sons, Inc.,* 161 B.R. 107, 116 (E.D.Pa. 1993), *aff'd* 37 F.3d 1487 (3d Cir.1994). It is an action "affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship. . . ." *See also In re Insilco Technologies, Inc.,* 330 B.R. 512, 520 (Bankr.D.Del.2005).

15. Similarly Lucent's fraud and negligence counterclaims arise from Winstar's alleged conduct in connection with the Second Credit Agreement. This is also an agreement related to the Supply Agreement.[17] It provided the means by which Winstar was to obtain financing to pay for

---

**17.** Section 11.3(a) of the Supply Agreement expressly provides:

Lucent shall provide WinStar financing in accordance with the Credit Agreement and

otherwise in accordance with the terms of this Agreement.

goods and services under the Supply Agreement, including those services subcontracted to Wireless under the Subcontract, and thus Winstar's conduct in connection with its draws under the Second Credit Agreement is within the ambit of the Proof of Claim. Moreover, the Second Credit Agreement gave Lucent the right to conduct the due diligence about which it now complains. The counterclaims are now part of the claims allowance process and within the core jurisdiction of this Court. 28 U.S.C. § 157(b)(2)(B).

■ 16. Finally, even if these matters were non-core, Lucent has waived its objection to this Court's entry of final orders by its conduct. *Abramowitz v. Palmer*, 999 F.2d 1274, 1280 (8th Cir.1993); *In re G.S.F. Corp.*, 938 F.2d 1467, 1476 (1st Cir. 1991); *In re Daniels–Head & Associates*, 819 F.2d 914, 918–19 (9th Cir.1987).[18] Not only has Lucent narrowed what counts and counterclaims it believes fall outside the core jurisdiction of the Bankruptcy Court,[19] Lucent repeatedly sought judgment in its favor without noting that the Court could only recommend findings and conclusions to the district court.[20] *Baldwin–United Corp. v. Thompson (In re Baldwin–United Corp.)*, 48 B.R. 49, 54 (Bankr.S.D.Ohio 1985) (consent may be implied from failure to object or from any act indicating a willingness to have the bankruptcy court determine a claim). Similarly in the Joint Pretrial Memorandum [Docket # 292] Lucent did not raise the core or non-core nature of the claims and counterclaims as one of the legal issues to be determined. Finally Lucent has asserted a setoff claim against the estate which it acknowledges is a core matter. *In re Iridium Operating LLC*, 285 B.R. 822, 832 (S.D.N.Y.2002). The parties agree Lucent's setoff claim be set off against any monetary award on the breach of the Subcontract claim. The Court believes this is further evidence of Lucent's waiver.

17. For all of the foregoing reasons, the Court concludes these are all core

**18.** Although Fed. R. Bankr.P. 7012(b) provides that in non-core matters, "final orders and judgments shall not be entered on the bankruptcy judge's order except by *express* consent of the parties," the substantial weight of authority holds that consent may be implied. 10 Collier on Bankruptcy ¶ 7012.11 at 7012–25 n. 3 (Bender 2003). Moreover courts have found expressions of consent based upon a party's actions such as filing a complaint. *Id.* In its counterclaims contained in the Second Amended Answer, Lucent pled only that counterclaims one and two were core. The pleading is silent with respect to any mention of whether the remaining counterclaims are core or not. But in pleading, Lucent requested that judgment be entered in its favor on all counterclaims which should properly be viewed as Lucent's express consent to this Court's jurisdiction to enter final orders.

**19.** In its closing argument Lucent argued that the Court could not enter a final order only with respect to the breach of the Subcontract claim (Tr. 22–50) and thus the Court finds Lucent waived its objection to the entry of final orders with respect to its counterclaims.

**20.** During closing argument Lucent's attorney conceded, in response to questioning by the Court, that he had not raised the issue of core versus non-core jurisdiction with the Court directly but had informed the Court during the summary judgment arguments that Lucent had sought certification of the district court's order. At the summary judgment argument, counsel's sole discussion of any challenge to this Court's jurisdiction was as follows:

Mr. Saunders: Your Honor, I should point out, unless Your Honor already knows this, that we have asked Judge Famum to certify, under Section 1292(b), the jury trial issue. Transcript of December 14, 2004 Hearing [Docket # 274] at 20–21. Moreover the argument that this statement put the Court on notice that the core/non-core dichotomy was at issue in the district court is wholly inconsistent with Lucent's argument that the district court focused only on the jury trial issue and did not address the core/non-core issue.

matters under 28 U.S.C. § 157 and, to the extent not core matters, Lucent has consented to entry of final orders by this Court. Under the Standing Order of Reference, the Court will enter final judgment.

## OVERVIEW OF FACTS AND THE PARTIES' CLAIMS

18. At its essence this case is simply a tale of two companies –one large, one small which entered into what each expected to be a mutually beneficial relationship to build a wireless communications network and deliver services to customers via that network. What became apparent as the evidence unfolded was that what began as a "strategic partnership" to benefit both parties quickly degenerated into a relationship in which the much larger company bullied and threatened the smaller into taking actions that were designed to benefit the larger at the expense of the smaller. Along the way some executives of each company demonstrated their incompetence and arrogance, and in some instances, now find themselves targets of criminal investigations. The Court notes that there was poor communications not only between the two companies but among each companies' employees. In fact, when Lucent replaced some of its upper level management in the fall of 2000 in response to an internal and SEC investigations, the new executives issued directives regarding the Winstar–Lucent relationship without having even read the operative agreements. Officers and executives often saw the relationship unfolding from different perspectives such that, if the Court were so inclined to view each witness' testimony in isolation, it could find support for virtually any fact. Yet taking all the *credible* evidence as a whole, it is clear that Lucent used Winstar to inflate Lucent's own revenues, especially in the third and fourth quarters of 2000 when Lucent was "feeling a lot of pressure on revenue." (Hayes, Depo, Tr. 13–38).

Although Winstar benefitted from some of its dealings with Lucent and its own actions were, at times, no less questionable than Lucent's, the facts point to one conclusion: Lucent extracted what it needed to prop up its own revenue from Winstar in the form of purchases by Winstar of unneeded equipment and manipulated the timing of a refinancing notice that would have put the world on notice that Winstar was in dire financial straits until Lucent could take some more. Lucent used its position as Winstar's lender to ensure Winstar's cooperation by repeated threats to stop both the funding of Winstar's draw requests and the payment of Wireless's invoices for services already performed.

### Summary of the Trustee's Claims

19. Although the parties tried this case for 21 trial days, surprisingly most of the critical facts surrounding the relationship of the Debtors and the Defendant are not disputed. The parties could have and should have saved their own and this Court's resources by agreeing to many more underlying facts which really are not disputed.

20. Prior to their bankruptcies, Winstar, a Delaware corporation, was a local and long distance telecommunications carrier and engaged in the buildout of a global broadband telecommunications network to service its customers. (DX 701 at 8). Its stock was publicly traded. (DX 701; PX 460). Wireless, Winstar's wholly-owned subsidiary, was also a Delaware corporation engaged in the design and construction of Winstar's network. (Revised Joint Stipulation ¶¶ 1 and 2).

21. Starting at the customer's end, Winstar would build facilities within the customer's building, known as a "B site," to connect the customer to Winstar's voice and data network via a radio and antenna located on the roof of the customer's build-

ing. Radios and antennae were also located on the roof of a Winstar's traffic collection point known as a "hub." Signals were sent between the B site and hub via the radios and antennae. (DX 699 at page 9, line 15 through page 10, line 38).[21]

22. The hubs, in turn, collected the signal traffic and distributed it to a high capacity facility known as a "central office." Typically signals were transmitted between hubs and central offices via fiber cables, either owned by Winstar or leased from an incumbent telephone company. (*Id.*).

23. The central offices had data and voice switching equipment which would connect transmissions from the central office either into other local or long-distance telephone companies or into Winstar's own national fiber network which provided long-haul capacity for Winstar's voice and data services. (*Id.*).

24. Winstar's long-haul network typically was made of fiber supplied by non-Lucent vendors and ran along routes that connected one city to another. (Kipke, Tr. 18–190). Optical equipment that amplified and transmitted the signals were generally located at each end of and at certain intervals along the fiber. (Kipke, Tr. 17–72–73).

25. Lucent, is also a Delaware corporation, whose stock is publicly-traded on the New York stock exchange (DX 739 at ¶ 12). It designs and delivers telecommunications systems, services, and products, including software. (Revised Joint Stipulation ¶ 5). It was, at the relevant times, much larger in size and resources than the Debtors. (Ackerman, Video–Direct, p. 17, line 18–p. 18, line 5).

26. In the late nineties, telecommunications companies were "hot" companies, and on the grow. Winstar, like many others, desired to increase the size and reach of its network and joined forces with Lucent to help accomplish the expansion. Prior to that time, Winstar and Lucent had an arms'-length vendor-creditor relationship whereby Lucent sold goods to Winstar. (Ackerman, Video–Direct at p. 4, line 12). That relationship changed in October 1998 when the two entered into what they both describe as a "strategic partnership." (Ackerman, Video–Direct at pp. 3–4). The "strategic partnership"[22] was created through a series of agreements, three of which figure prominently in this litigation.

27. In October 1998, after three weeks of "lockdown" negotiations, Lucent and Winstar entered into two related agreements: the First Credit Agreement and the Supply Agreement. (*Id.*). Under the First Credit Agreement, dated October 21, 1998, Lucent became the primary secured lender to Winstar and provided a $2 billion line of credit (although only $500 million could be borrowed at any one time) to be used for the purchase of certain products and services in exchange for a lien in virtually all of Winstar's assets. Wireless was not a borrower, guarantor, or otherwise a signatory to the First Credit Agreement. (Revised Joint Stipulation ¶¶ 13

---

**21.** DX 699 is a transcript of the testimony of David Ackerman, Winstar's former group executive/executive vice president for corporate strategy and business planning, given under oath on October 11, 2001 as part of the investigation by the Securities and Exchange Commission ("SEC") styled *In the Matter of Lucent Technologies, Inc.,* file no. HO–9128 (the "SEC Action"). The transcript of the Ackerman videotaped deposition to which DX 699

is an exhibit was admitted as Joint Trial Exhibit 6.

**22.** The "strategic partnership" was not actually a partnership, a fact Lucent spent considerable time emphasizing. The parties used the term simply to connote their intent to work closely and collaboratively. *See* October 22, 1998 Joint Press Release (PX 331).

and 14). When the parties entered into the First and subsequently Second Credit Agreements, Lucent expected that the loans were be repaid either by borrowing from other lenders or by raising equity. (Hayes, Depo, Tr. 13–36).

28. Under the Supply Agreement Lucent agreed to provide and finance (under the First Credit Agreement which was later supplanted by the Second Credit Agreement) the purchase of products and services. (Revised Joint Stipulation ¶ 6). Lucent was to provide equipment of a quality described as "Best of Breed" and, in instances where it could not provide Best of Breed equipment, it was obligated to finance Winstar's purchase of such equipment from other vendors.[23] (Ackerman, Video–Direct at pp. 81–82; PX 123 at ¶ 11.3 and Schedule H thereto).

29. To assure that the content of the Winstar network was primarily equipment manufactured and/or sold by Lucent, to develop and enhance its reputation for providing these type of buildout services in a "hot" telecommunications world, and ultimately to enhance its revenue production, Lucent wanted to build Winstar's entire global network, including all supporting infrastructures, on a completely turnkey basis. Consequently the Supply Agreement provided that Lucent would build and deliver a turnkey operation to Winstar. As with its obligations to finance Best of Breed equipment even if supplied by third parties, if Lucent itself was unable to perform the services needed to comply with buildout obligations, it was obligated to finance the payment of those services provided by others who would develop the turnkey system. (PX 123, section 11.3(c)).

30. When the parties entered the Supply Agreement, they both recognized that Lucent did not have all the core competencies necessary to perform the buildout. Therefore the Supply Agreement provided that Lucent would prepare a transition agreement that included a schedule of its assumption of various aspects of the buildout as broadly outlined in the Supply Agreement. (PX 123 at Schedule A, § 3.3). No transition agreement was executed and it quickly became apparent that Lucent either could not or would not take over the building of the turnkey network as promptly as anticipated. (Kantor, Video–Cross at pp. 46–48).[24] In March 1999 Lucent and Wireless entered into the Subcontract, effective January 4, 1999, whereby Wireless agreed to act as Lucent's subcontractor and build the network at least until such time as Lucent was willing and able to assume that role. (Revised Joint Stipulation ¶ 7). Wireless would perform the services, many or most of which were the types of service it had already been performing directly for Winstar, as Lucent's subcontractor and then bill Lucent.[25]

---

**23.** The Supply Agreement provides that 65% of the equipment and services purchased during the first year of the contract would be purchased from Lucent. The percentage increased to 70% thereafter. (PX 123 at ¶ 11.3(b)(1)). The Supply Agreement also permits Lucent to surcharge Winstar if Lucent funds the purchase of goods and services from other vendors beyond the applicable percentages. There was no evidence to suggest that Lucent ever surcharged Winstar despite the fact that the parties agree Lucent funded substantially more non-Lucent purchases than percentages set forth in the Supply Agreement.

**24.** The transcript of Kantor's videotaped deposition testimony is Joint Trial Exhibit 1.

**25.** Lucent attempted to portray this arrangement as a scheme perpetrated and controlled by Winstar to enhance its own financials through questionable accounting practices. The Court disagrees. While there is evidence to suggest that this arrangement gave Winstar the means to capitalize many of its network buildout expenses, most of these expenses

Lucent, in turn, would bill Winstar which would pay Lucent by drawing down under the First Credit Agreement or, after May 2000, the Second Credit Agreement. In essence Lucent loaned Winstar the money to pay Lucent for building the network; Lucent then paid the money over to Wireless. The paperwork, especially the purchase orders, were exchanged after the work was completed. It is Lucent's refusal to pay for services for the month of March 2001 that gives rise to the Count Seven, the breach of the Subcontract claim.

31. As Winstar grew and required additional financing to feed its insatiable appetite for cash to grow its business, it sought bank financing and in May 2000 arranged for a consortium of bank lenders, with Bank of New York as the administrative and collateral agent, to provide a $1.15 billion revolving credit and term loan (the "Bank Facility") for part of its working capital needs. WCI Capital Corp ("WCI Capital"), one of Winstar's subsidiaries, was the borrower; Winstar and certain other of its subsidiaries were guarantors.

32. The First Credit Agreement, pursuant to which Winstar had borrowed approximately $1.2 billion, was paid off with a portion of the proceeds of the Bank Facility and other funds raised by Winstar. Lucent released its lien in Winstar's assets. (Revised Stipulation ¶ 8).

33. Winstar also had raised money in the public debt and equity markets over the years. (DX 701 at 26 and 48).

34. As Winstar was growing and building out a global telecommunications network, it was purchasing millions of dollars of equipment from Lucent. Lucent desired to keep its good customer relationship with Winstar and thus in May 2000, simultaneously with the execution of the Bank Facility and repayment of the $1.2 million owed under the First Credit Agreement, the parties entered into the Second Credit Agreement whereby Winstar received from Lucent a $2 billion line of credit with the ability to borrow up to $1 billion at any one time. WVF–I LLC ("WVF–I"), a newly formed subsidiary of Winstar was the actual borrower;[26] Winstar and WCI Capital, the borrower under the Bank Facility, were the guarantors. (DX 38). Among other things, the Second Credit Agreement permitted WVF–I to purchase both Lucent and non-Lucent equipment and in exchange WVF–I granted Lucent a security interest ahead of the Bank Facility only in the equipment Lucent financed Lucent also took a security interest in WVF–I's "general intangibles" and "proceeds." The Second Credit Agreement also contained certain financial covenants, including a covenant that Winstar not permit its total Cash Capital Expenditures ("CAPEX") to exceed $1.3 billion in "any year prior to and including 2001";[27] and entitled Lucent to serve a

could be capitalized even without flowing them through Lucent. (Harris, Depo, Tr. 11 at 47).

26. The Second Credit Agreement contemplated the future formation of other Winstar subsidiaries to act as borrowers under the Agreement. Subsequently WVF–LU2 LLC ("WVF–LU2") was formed and was also a borrower under the Second Credit Agreement. It also acquired equipment with funds borrowed under the Second Credit Agreement and gave Lucent a security interest in that equipment.

WVF–LU2 is the entity that requested the March 30, 2001 borrowing in the amount of $62,050,743.00. (DX 668). The parties, however, refer to the request as Winstar's request and throughout the conduct of this case did not draw distinctions as to which Winstar entity actually made the funding request.

27. The Second Credit Agreement contained other financial covenants including the obligation that Winstar give Lucent Winstar's financial information signed by an officer who was to certify that the financial statements

"refinance notice" on Winstar if the outstanding loans exceeded $500,000,000. It also provided that any increases in the Bank senior loan arrangement would be used to repay Lucent. It is a partial repayment made to Lucent pursuant to the Second Credit Agreement, using funds from the so-called Siemans Transaction, that gives rise to Count 10, the preference claim.

35. Winstar repeatedly and knowingly helped Lucent by making massive, last minute, allegedly unneeded purchases that were arranged by Lucent as the ends of quarters approached. These end of quarter deals enabled Lucent to report more revenue and appear more profitable in its quarterly public reports than it really was.[28] In fact the dollar amount of Winstar's purchases of Lucent equipment in end of quarter sales was on average eight times as high as the dollar amount of Winstar purchases of Lucent equipment in months in which a quarter did not end. Lucent used these end of quarter deals to close its own revenue gaps.

36. In addition to the end of quarter deals, Winstar helped Lucent record revenue through alleged accounting schemes such as improper bill and hold deals,[29] whereby Winstar would pay for goods that it did not need, often were not identified with any kind of particularity, and frequently never even left the Lucent warehouse. The Trustee alleges that the Software Pool Agreement, dated September 29, 2000 (PX 323), whereby Winstar was to pay Lucent $135 million, in four equal payments of $33.75 million to be made in January, March, June, and August 2001, for software it did not need, did not use, and had a fair market value of substantially less than the contract price was another in a series of sham transactions that were designed to do little more than inflate Lucent's revenue.[30]

were kept according to generally accepted accounting principles and that Winstar was in compliance with the Credit Agreements. Moreover each draw request under the Credit Agreements was considered an independent certification that Winstar was in compliance with the covenants. At trial Lucent sought to introduce evidence regarding breaches of these covenants but because Lucent did not raise these issues in the Joint Pretrial Memorandum, the Court refused the introduction of such evidence. Lucent did make an offer of proof that it did not consider it its responsibility to verify the certified draw requests. Even if the evidence of these breaches was properly before the Court and even assuming that Winstar, in fact, breached these additional covenants, the outcome would be no different. As discussed *infra,* Lucent cannot divert its own independent knowledge of Winstar's true financial condition, including its complicity in trying to help Winstar meet the CAPEX requirement, by hiding behind Winstar's alleged breaches.

In addition the Second Credit Agreement also contained express covenants dealing with foreign collateral, EBITDA, and transaction fees. Again because Lucent did not raise these issues in the Pretrial Memorandum, the Court refused to consider evidence of these alleged breaches. But again, given Lucent's knowledge of the state of Winstar's affairs, it cannot feign that it was somehow deceived.

28. As discussed in greater detail below, the distortion of Lucent's financial picture lead to an SEC investigation that resulted in the commencement of a lawsuit for alleged violations of various securities laws against Lucent, several of its former employees, and three former employees of Winstar.

29. Bill and hold sales are transactions in which a party sells goods to another party but, at the purchaser's request, stores the goods in the seller's facility for shipment at a later date.

30. Winstar could not use funding from the Second Credit Agreement to pay for its purchases under the Software Pool Agreement. (PX 323 at ¶ 6 "Winstar agrees that it will maintain sufficient cash on hand to meet the above-described payment obligations at the respective Invoice Dates independent of any financing arrangements in place between Lucent and Winstar.")

37. The actions of Lucent in allegedly forcing Winstar to enter into transactions such as the end of quarter purchases, bill and hold deals and the Software Pool Agreement, as well as Lucent's alleged delay in negotiating a transition agreement during the later part of 2000 in order to gain leverage over Winstar and its alleged delay in issuing the refinancing notice in order to improve its position viz a vie other creditors, give rise to Count 11, the claim of equitable subordination.[31]

### Summary of Lucent's Counterclaims

38. One of the covenants of the Second Credit Agreement required Winstar's CAPEX to not exceed $1.3 billion in any year prior to and including 2001. It is Winstar's alleged CAPEX in excess of the $1.3 billion limitation, its behavior to bring its CAPEX into compliance, its failure to undertake inquiry regarding its CAPEX, and its certification in each borrowing request that all covenants have been or would be met by the time of the borrowing that give rise to both Lucent's counterclaim for fraud, Counterclaim 5, and its counterclaim for negligent misrepresentation, Counterclaim 6.

### COUNT VII: BREACH OF THE SUB-CONTRACT

39. The Trustee contends in Count Seven of the Second Amended Complaint that Lucent breached the Subcontract between Wireless and Lucent, thereby causing Wireless $62,050,742.00 in damages.

Lucent responds that it was not required to perform under Subcontract because there was no "task order" for the work performed.

### The Subcontract and Task Orders, Purchase Orders, Invoices and Spreadsheets

40. The Subcontract expressly provides:

1.1. *Services.* Contractor agrees to perform for Lucent the tasks, responsibilities and services described on the attached task specific schedule(s) (individually a "Task Order") (the "Services"). The parties may enter into future Task Orders, to which the parties agree, from time to time, with each Task Order to be consecutively numbered and attached hereto. Services shall be provided in accordance with the provisions of this Agreement and the applicable Task Order and shall be on either a firm, fixed price or time and materials basis as specified in the applicable Task Order executed by both parties.

1.2. *Task Order.* Unless otherwise agreed by the parties in writing, each Task Order will include the following information: (i) a description of the Services to be performed; (ii) the targeted commencement and completion dates of the Services; (iii) a list of deliverables to be provided by Contractor (the "Deliverables") and targeted delivery dates; (iv) methods of compensation to be provided to the Contractor (e.g., time and materials, firm fixed price or otherwise) and

---

**31.** In Count XI of her Second Amended Complaint, the Trustee alleges that the Siemans loan is the transaction which give rise to her request for equitable subordination and seeks return of the Siemans loan proceeds and subordination of Lucent's claim. At trial the evidence of Lucent's alleged impermissible conduct was much broader and therefore, to the extent necessary, the Second Amended Complaint is deemed amended to conform to the evidence as such amendment in no way prejudiced Lucent's rights. *See* Fed.R.Civ.P.

15(b), made applicable by Fed. R. Bankr.P. 7015(b); *see generally* 6A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d §§ 1491,1493 (1990 & Supp.2003). In fact the parties themselves agreed at the end of the trial that their pleadings should be deemed amended to conform to the evidence (which would not include any of the offers of proof) as long as neither party added any new claims, counterclaims, or defenses. *See* Tr. 21–135–140.

other appropriate pricing terms such as hourly rates; and (v) other information the parties agree to include.

41. Even though the Subcontract called for Winstar to submit task orders to Lucent prior to Wireless's provision of services, the parties ignored this requirement and between January 1999 and October 2000, Lucent paid Wireless approximately $325 million for services performed under the Subcontract, most, if not all, without a prior written task order. In fact the parties agree that after the first quarter of 1999 they never exchanged a single task order (Revised Joint Stipulation ¶ 20).[32] Nathan Kantor, Winstar's President and Chief Operating Officer when the relevant agreements, including the Subcontract were negotiated and approved, testified that it was his understanding that Lucent and Winstar agreed that the invoices would function as the equivalent of the task orders. (Kantor, Video at 356–57). "The contract was administered by using the invoices and a Lucent purchase order to reflect these task orders and the work that was performed by Winstar to Lucent and agreed to by Lucent and those invoices were paid for several years." (Kantor, Video at 361–62).

42. Yet if the letter dated January 4, 1999 is a task order, the parties quickly dispensed with the task order process, opting instead to exchange less formal documentation, including purchase orders, invoices and spreadsheets summarizing Wireless' charges. Generally Winstar sent a purchase order to Lucent which, in turn, sent a purchase order to Wireless. Wireless performed the services and then sent Lucent an invoice, with or without an accompanying spreadsheet showing the breakdown of services or goods. Lucent then invoiced Winstar in the same amount as Lucent was billed by Wireless. Then, as described above, Winstar would draw down under the applicable Credit Agreement, use the draw to pay Lucent which would then pay its obligation to Wireless. In fact, Richard Uhl, Winstar's former Chief Financial Officer provided credible testimony about how payments were sought and obtained, as well as the underlying reason for dispensing with formal task orders.

> Well, Lucent, the original agreement required that Lucent issue purchase orders. Early on it was discovered that Lucent was unable or not capable of defining what should go into the purchase order. So the practice evolved, in

---

**32.** The task order for that first quarter, dated January 4, 1999, was not actually executed until March 1999 when the parties also executed the Subcontract (Wilson, Tr. 16, 105–06) and this document, which the Defendant describes as the only task order executed, is actually a letter, dated January 4, 1999, from Lucent's Vice President of Emerging Services to a Winstar employee that reads as follows:

> Pursuant to our recently executed *Agreement for Network Build-out Services*, please accept this letter as my authorization for the subcontracting of Network Services from Winstar Wireless, Inc.
>
> The following is a list of services, which Lucent will subcontract to Winstar for an amount not to exceed $25 M for the period January 1, 1999 through March 31, 1999[:]

- Switch Site Planning & Construction
- Hub Site Planning & Construction
- Broadband Riser Engineering
- Inside Wire engineering
- Network Integration (CO & Hubs)
- Network Integration (B Sites)
- Site Surveys
- Site Acquisition

> Thank you in advance for your support.

(First page, bearing Bates Stamp WC0019778, of DX 117). Even this "task order" is devoid of the details that Lucent argues must be present for a writing to comply with the Section 1.2 of the Subcontract and be considered a "task order."

fact, was present when I became CFO in the fall of '99 that inasmuch as Lucent could not produce the details of the purchase order, Winstar Wireless would as its subcontractor to Lucent issue an invoice which Lucent would then cover with a purchase order and that was the sequence. That was the sequence present and existing when I assumed responsibility for Chief financial Officer's position in the fall of 1999.

(Uhl, Video-direct at 11).[33]

43. Shortly after entering the Supply Agreement, Lucent began to balk at the arrangement and as early as June 1999, Lucent threatened to pull the plug. Shortly after entering the Subcontract, Lucent determined very quickly that the pass-through payment arrangement "yielded no material benefit for Lucent, and in fact cost [Lucent] considerable resources to process, track and manage." (DX 163; *see also* Wilson, Tr. 16–30). Lucent could not recognize revenue on the pass-through transaction because it did not have sufficient control over the services being performed by Winstar's employees to allow revenue recognition under the accounting rules. (PX 388 at LW 00303141; DX 523; *see also* DX 155 at 2WC 0016320.) Lucent was also concerned that financing any additional services would hamper its ability to sell Winstar's loans because the banks it consulted with concerning such financing were "very negative on the inclusion of these Incremental services." (DX 149 at WC 0118574; *see* Wilson, Tr. 16–28–29; DX 155; *see also* DX 137.). And Lucent was attempting to sell the Winstar loan as it was among the largest loan Lucent had financed. (Hayes, Depo, Tr. 13–33). Consequently in early June 1999, even though Lucent was still unwilling or unable to build the turnkey operation as required under the Subcontract, it informed Winstar that it would not pass through any additional services because it was "concerned about having to severely discount the paper to sell it." (DX 154.)

44. Quickly discussion escalated to the chief executive level and ultimately Lucent agreed to continue the arrangement and it did so up until March 2001 when Lucent refused to pay for the previously rendered services ostensibly because there was no task order.

45. Lucent ultimately agreed to finance Wireless-performed services and facilitate the favorable accounting treatment that Winstar desired by passing through the 2Q1999 services. (Wilson, Tr. 16–54.) Lucent only did so as an accommodation to Winstar, which claimed that ending the pass-through would have negative financial repercussions and which promised to negotiate a true turnkey approach to services that would allow Lucent to recognize revenue on such services in the future. "[T]here was a large pressure from Winstar to go ahead and [pass through services because Winstar] felt like it would have implications on their earnings report since they were capitalizing these services last quarter, and had it not happened this quarter it would reflect badly on their announcement." (*Id.*) Therefore, Lucent agreed to pass through Wireless-performed services in 2Q1999 "with the agreement from Winstar that [Winstar and Lucent] would pursue a business arrangement structure around a turnkey approach to the projects and network implementation that would then, again, well define the tasks for each company to perform, orders up front from Winstar to Lucent, Lucent then going through those task lists and ordering back from Winstar what we could not perform." (*Id.; see also* DX 164.)

---

**33.** The transcript of Uhl's videotaped deposition testimony is Joint Trial Exhibit 13.

46. On September 8, 2000 Winstar issued a purchase order, WVF 1–00000002958 (*See also* DX 390 and 391 referencing Lucent's position with respect to the September 8th invoice) that in line item number 1, sought payment of $65,509,331.00. But by this time Lucent was not inclined to increase the Winstar loan. In fact, Lucent was seeking to rid itself of some or all of this debt. At about this time Lucent was seeking to sell the Winstar loan. In mid-September 2000 Deborah Hopkins (Lucent's CFO), Rich McGinn (Lucent's President and CEO), Fred Rubin (Lucent's Treasurer and Senior Vice President), Richard Uhl (Winstar's CFO), and William Rouhana (Winstar's CEO) met with senior officers of the Bank of New York at a luncheon meeting at the Water Club. One of the goals of the meeting was to get the Bank of New York to buy the Winstar debt. The deal was not consummated as the financial market collapsed on the same day as the meeting. (Uhl, Video 282–83).

47. On September 21, 2000 Deborah Harris and William Plunkett of Lucent had a conversation with David Ackerman and Richard Uhl of Winstar and informed them that Lucent would not pay the $65,509,331. The next day Deborah Harris followed up the conversation with an email and a letter (PX–15) which reads in part:

> At the signing of the supply agreement certain services in support of the Winstar network deployment were described as potentially being performed by Lucent Technologies. The actual assumption of these services was contingent upon the development and successful execution of a transition plan for services that Lucent and Winstar agreed were Lucent competencies and could be successfully executed by Lucent.

> \*      \*      \*      \*      \*      \*

> There is a category of services which, to date, Winstar continues to provide for itself. . .

> We have been pursuing ways to take on these services in a manner agreeable to all parties, but have not been able to reach consensus. Consequently, we believe it is not appropriate for Lucent to accept Purchase Orders for these services. Specifically, we must reluctantly reject line item # 1 of the Purchase Order for $65,509,331.00, WVF 1–00000002958 issued by Winstar on September 8, 2000. Lucent stands ready to negotiate an arrangement under which Lucent becomes responsible for some or all of these services, whether via outsourcing or some other method. We suggest that Lucent and Winstar each designate an empowered team to move ahead with these negotiations with the goal of completing by October 1, 2000. If you agree with this suggestion, we are ready to start immediately beginning with a kickoff meeting next week.

48. At the time of the Harris letter, Lucent, however, had still not developed the core competencies needed for it to assume the buildout by itself. The suggestion that Lucent was ready and willing to perform the buildout and would do so but for the failure of the parties to agree to a transition plan was nothing more than an attempt to create a pretext for denying further draws under the Second Credit Agreement so that Lucent could renegotiate the terms of the "strategic partnership" for its benefit.

49. In fact, Lucent's demands for a financial concession had already begun by the time of the Harris' letter as had its pressure on Winstar to help Lucent make its end of quarter numbers as reflected in a September 18, 2000 email sent on Harris' behalf.

Nina and Bill:

I have tried to do a very brief summary of all the "good, bad and ugly" on this account. Bottom line is that to do an EOQ [end of quarter] deal, we need Nate to provide direction to Ackerman and Uhl that this will take place. They are vehement that they are out of money and do not want to spend money on product that they can not immediately utilize. The deals of the past are haunting us...there is $87M in their warehouses. But much of this is also due to problems with Williams.

We have a restructured proposals that categorizes what they need now through to long term. Definitely the majority of the money we are asking for is not for immediate use. It also includes pricing for the B's and Hubs which is 2 tiered, and time sensitive. Depending on how fast we can implement and identify cost reductions thru [sic] the breakthru [sic] items, could cause our BGP to hover around 30% or below.

What 1 need are 2 things:

**1. A call to Nate Kantor getting agreement to move forward on an EOQ deal**. Our meeting with Dave Ackerman is first thing Tuesday morning, so this would need to happen today. We believe they already will be spending around $46M with us, so we are asking for another $50–60M. (I am trying to get the total number in the $110–115M range).

2. Agreement that we can discuss at 5:15 today, on the aggressiveness of the proposal.... (PX 86)(emphasis in the original).

50. The same email transmission further supports a finding that Lucent was not only pressuring Winstar to do deals that were designed to benefit Lucent at Winstar's expense but conspiring to ensure that the lucrative to Lucent end of quarter deals got done.

Following are the "headlines" for the Winstar account:

\*   \*   \*   \*   \*   \*

• Winstar Services: We pass through around $67M/Q of WinstarServices. We have been told to stop this practice. We will be communicating our position to Winstar the week of 9/18, including options of what portions of these services we can do. **We may want to delay this move for a quarter based on this EOQ deal.**

\*   \*   \*   \*   \*   \*

• Previous EOQ Deals: ...

– Winstar does have major inventory as a consequence of these deals.

– Credits provided in all the previous EOQ deals are now hitting in 4Q2000 results.... (PX 86) (emphasis added).

51. Aversano placed the call to Kantor and, despite Winstar's financial condition, the deal was done. (Aversano, Video Tr. at 8). As Kantor subsequently wrote to Aversano, "Great to talk to you and we will help whenever possible." (PX 157). Kantor then instructed Ackerman to make the Lucent deal, which ultimately turned into a deal for $212 million in end of quarter purchases, happen. (PX 56).

52. Yet as David Ackerman wrote to Kantor in a September 18, 2000 e-mail, in view of Winstar's CAPEX issues, complying with Kantor's instructions to provide substantial revenue to Lucent would not be possible unless Ackerman got "creative:"

I just spoke with [Lucent employee Bill] Plunkett. He informed me that you and Nina [Aversano] had met (dinner?) and you agreed to help them get to the number they need this quarter ... something around $110M, of which we've already spent about $45M. There is not much I can give them that we really

need, but there are some creative things I can do that can get us close to their number without being totally stupid.

\*　　\*　　\*　　\*　　\*　　\*

Thus; we are working to cut another $70 [Million] in addition to the $117 [Million] [to meet capex covenants]. This means stopping ANY and ALL incremental spends for ANYTHING capex immediately, and letting capitalized contractors go . . .

\*　　\*　　\*　　\*　　\*　　\*

How much capital CAN I REALLY SPEND THIS YEAR, and how much do I do to give Lucent what they need for 3Q?

If the answer is; both give Lucent the business, AND reduce the cap spend to $1B even I will need to institute some very severe measures immediately.

(PX–127) (Emphasis in original).

53. After receiving a copy of the September 22, 2000 email and letter, Nate Kantor, Winstar's President and COO, sent the following email to Nina Aversano, President of Lucent's North America group (PX–16):

I am very surprised and disappointed with this-we've only discussed it a million times. This doesn't sit well with me and will have a major impact on our ability to help you this quarter.

You've got to get this fixed.

54. On September 25, 2000 James Cocito, Lucent's chief operating officer of its North America Region, sent Frank Manzi an email suggesting that Lucent consider the possibility of " 'a one more time' strategy." (PX 88). As Cochito noted in his email, "[Kantor] has indicated there will be no deal for the QTR unless this gets fixed. Impact about 60M or more. Also, I will

know as of this morning whether they are going to play with the AR as well."

55. On September 27, 2000 Nina Aversano, President of Lucent's North America Region sent Richard Uhl, Winstar's CFO,[34] a letter (PX 17)[35] that purported to modify the terms under which the two companies did business and containing the conditions under which Lucent would pay the September 8, 2000 Purchase Order.

This is to inform you that Lucent will accept your purchase order WVF 1–0000002958[sic] conditioned upon Winstar's agreeing to the following terms and conditions. If you agree, kindly sign in the space provided below and return to me. Immediately. Nate, this is a great opportunity for us to move our relationship forward to what we envisioned-a seamless partnership where the many resources of Lucent can be utilized to help achieve Winstar's business plan. I hope you agree with me that we should seize the moment.

It would appear that there has been a great deal of confusion between us regarding which services and to what extent services would be provided by Lucent to Winstar under our Supply Agreement dated October 21, 1998. Pursuant TO Schedule A of that contract the parties intended a transition plan for Lucent to take over services that at that time Winstar was providing to itself. This was a broad plan possibly leading to a full outsourcing of all Winstar required services to Lucent Since the signing of that contract there have been a number of attempts to formalize this broad services relationship. The last such attempt was undertaken this past June when the parties entered into two addenda– the Hub and B–Site Ad-

---

**34.** The letter is addressed to Uhl but contains the salutation "Dear Nate."

**35.** The same document is also a Defendant's exhibit (DX 424).

dendum [PX–18] and the Optical Network Addendum [PX–19]. These addenda did not include the full range of services contemplated in the Supply Contract.

I'm sure you would agree that the fault for the failure to execute on our original concept lies with both Winstar and lucent. Happily it appears we both favor the same result-a broad services relationship. We need to finalize that result as soon as possible so that our contractual relationship matches our mutual intent. We propose that commencing Monday morning October 2nd, or as soon thereafter as is reasonably possible, out two teams meet at your offices to finalize a broad services agreement. This would be a lock-up session to finalize a full service agreement no later than two weeks thereafter. Consistent with the principles already established in our two addenda referenced above, Lucent would have complete control of the work covered by the scope of work the parties mutually define in this new agreement. Lucent may either perform the work itself by acquiring expertise and personnel from Winstar, or subcontract some or all of it to third parties (including Winstar). Consistent with this model, commencing October 1, 2000, Winstar would perform this work only upon prior receipt of a mutually acceptable written purchase order from Lucent (and not at its sole initiative). Should this process not be followed, Lucent would not be able to accept purchase orders or invoices for any Winstar performed services that are outside the scope of work defined in this agreement. Further, until this new service agreement is in place, Lucent will not be able to accept purchase orders or invoices for services performed by Winstar after September 30, 2000 that are either outside the scope of the two addenda refer-

enced above or that fall within the scope of the new, as yet unexecuted, service agreement. Prior to Winstar performing any work that might rightfully fall within either of the two existing addenda referenced above, Lucent would need to issue mutually acceptable written purchase orders. Should this process not be followed, Lucent would not be able to accept purchase orders or invoices for any Winstar performed services presumably on Lucent's behalf.

I look forward to your prompt reply, and the further growth of our relationship consistent with our shared vision. . . .

56. Uhl signed the letter thereby acknowledging his assent and returned the same to Lucent. Uhl did not understand this letter to terminate the original agreement in the event the parties were unable to enter into a new agreement. (Uhl Video-direct at pp. 16, 18, and 19). Kantor understood that Lucent's financial people were demanding a letter because they needed to book revenue. (Kantor Video-direct at 180–81).

57. In addition to Uhl's signing the letter, Lucent extracted another and even more substantial financial concession from Winstar when, on September 29, 2000 the parties executed the Software Pool Agreement (PX 323). Under the Software Pool Agreement Winstar purchased $135 million of unneeded software. The transaction was simply a sham, however. It's purpose was to inflate Lucent's end of quarter revenues. To that end, the Software Pool Agreement was successful: it alone accounted for 26% of Lucent's profits that quarter. (DX 739 at ¶ 60).

58. The end of quarter deals for the third quarter of 2000 committed Winstar to make approximately $212 million in purchases and forced Winstar out of compli-

ance with the CAPEX covenant and over the $500 million refinancing threshold. (Ackerman Video at 605–08 and 666–69; PX 43; PX 57; PX 78; PX 107; PX 148).[36]

59. Lucent's Initial software proposal was for a much smaller amount—$25 million—but in less than nine days, with Kantor's promise to Lucent that Winstar would help "wherever possible," the pool expanded approximately five-fold to the $135 million figure. (PX–57; PX–323, Zlotnick Video-direct at 157). This increase occurred without the numerous internal studies or any of the other planning documentation that Mr. Pocalyko testified were typical. (DX–702; Pocalyko Tr. 3–41–42). As Lucent's Deborah Harris advised on September 22, 2000, "I know the overall Software request will be a surprise and that is an area where a conversation will be of (PX–52). benefit."

60. As part of this software pool transaction, the parties also agreed that Lucent's list pricing for the software, rather than Winstar's contractually-reduced pricing, would be used to further boost Lucent's revenue. (PX–53; PX–349). As Winstar executive William Zlotnick testified, the software deal was ultimately priced "at whatever Lucent needed for its revenue." (Zlotnick Video direct at 160–61; PX–79; see also PX–57). Of the $135 million of software, less than $20 million was of value to Winstar. (Zlotnick Video-direct at 169–71). In fact, in post-deal documentation Lucent took the position that Winstar was only entitled to select $20 million of software—and would have to pay extra if it wanted more—despite Winstar's obligation to pay $135 million in cash in 2001. (PX–54). Lucent later recanted this position.

61. To enable Winstar to make the required cash payment for the software, the companies agreed to enter into contracts for credits postdated after September 29, 2000 and payable in the fourth quarter of 2000 (i.e., before Winstar was obligated to actually make the software payments to Lucent), (PX–54; PX–57; PX–186 at internal tab 2; PX–324; PX–462 at 37; Rubin 2003 152:15—154:11).

62. On behalf of Winstar, Ackerman signed the post-dated credit agreements, enabling Lucent to book almost the entire amount of the software deal as revenue in Lucent's final fiscal quarter of 2000 (September 30, 2000). (PX–167; DX–739). Thus, Lucent funded Winstar's purchase of the unnecessary software in advance, to obtain Lucent's September 2000 revenue and profit infusion.

63. Shortly thereafter Rouhana, Winstar's Chairman and CEO, informed Schacht, one of Lucent's directors and who, as of October 23, 2000, resumed his previous position as CEO of Lucent, about the financial improprieties between the companies. Lucent retained its outside counsel to investigate its accounting procedures. The investigation resulted in Lucent's reversal of the revenue recognition from the Software Pool Agreement and a shake-up of the company's accounting staff. (Schacht, Tr. 21 at 33–35).

64. The Securities and Exchange Commission ("SEC") also conducted an investigation that ultimately lead to the SEC's filing a civil complaint against Lucent, certain key Lucent employees, including Deborah Harris, who as Vice President of Sales assumed responsibilities for the Winstar account in August 2000, and

**36.** Lucent was well aware of the CAPEX problem. Lucent proposed the Software Pool Agreement, which called for all payments to be deferred until 2001, as a way to commit funds to Lucent without further increasing Winstar's capital expenditures. (Zlotnick Video-direct at 156; the transcript of Zlotnick's testimony is Joint Trial Exhibit 3).

Plunkett, a member of Lucent's management team overseeing the Winstar account, and former Winstar employee, David Ackerman, a "Group Executive" responsible for the build out of Winstar's network. A criminal investigation is still ongoing. When deposed as part of the SEC, both Harris and Plunkett refused to answer citing their right against self-incrimination under the Fifth Amendment to the United States Constitution.

65. Lucent in fact terminated Mr. Plunkett for his involvement in postdating documents related to the software deal. (Schacht Tr. 21–35). It did nothing, however, to terminate or otherwise punish fellow Winstar Sales Team members Deborah Harris, Vanessa Petrini or David Rigotti, all of whom remained active on the Winstar account into 2001, and who were clearly culpable in the scheme to fraudulently post-date the deal documents. (See PX–73; PX–66). Thus, while Mr. Plunkett became the scapegoat, the transaction remained in place, and the other Lucent participants remained active on the core Winstar sales team. (Schacht, TR. 21–29:3–21, 21–33:13–17, 21–35:7–14).

66. Soon after sending her September 27, 2000 letter Aversano was relieved of her duties at Lucent and formally left Lucent in December 2000. (Aversano Depo, Tr. 8–22–24.). When she left, the parties had not executed a transition agreement nor had they resolved the ongoing problem of payment of the pass-through requests.

67. During this same time period Lucent was experiencing its own revenue crisis and was attempting to reduce its exposure on loans it was financing. (PX184). By at least mid October 2000 it drafted, but did not send, a refinancing notice as Winstar's outstanding borrowing exceeded the $500 million trigger. (Hayes, Depo, Tr. 13–40); PX 185 ("Per the email below, we are planning to issue a Refinancing Notice to Winstar next week."). Lucent was well aware of the impact sending such a notice could have. By email dated November 2, 2000, Paul Hayes, Lucent's Director of Syndication and whose job was created in late 1999 or early 2000 specifically to manage the process of removing loans from Lucent's books, circulated a memorandum from Beth Perricone addressing the implications of sending a refinancing notice to Winstar. (Hayes, Depo, Tr. 13–31; PX 187). That memorandum provides in part:

> Paul and I have studied the implications for Winstar and Lucent of issuing a refinance notice. . . .

*　*　*　*　*　*

*IV. Implications of Issuing a Refinance Notice:*

*Option 1–Issue a written 105 day refinance notice for all or a portion of the Lucent Loan*

Pros:

- Puts pressure on Winstar to seek alternative sources of capital (i.e. existing Bank Syndicate, Bondholders, Equity Sponsors, and Vendors);

- Forces parties to the table to deal with funding shortfall issues;

- Provides ability for Lucent to re-negotiate certain provisions, e.g. content requirements, limit non-Lucent content financing, eliminate Winstar pre-approval for Lucent loan sales, improve collateral position (i.e. pari passu with Bank Syndicate);

- Repayment by Winstar results in fresh $1B of Lucent financing available for Winstar;

- Lucent can always rescind or modify the refinancing notice

Cons:

- Winstar is likely to immediately file 8–K to disclose material adverse event, disclosing the amount of the financing;
- Disclosure may result in details of Lucent's financing becoming public;
- Market rumors may further disrupt capital markets and deter new investors;
- Existing Winstar securities could suffer price deterioration, further impacting market appetite and further depressing price of Lucent Loans;
- Potential Rating Agency implication for Lucent and Winstar;
- Potential increased cash flow requirement for Winstar, which would result at end of Refinance Period (90–105 days). If winstar does not refinance, rate on Lucent Loan increases by 2% (i.e. a potential $13.8 M in additional interest cost annually on current & 690 M of Lucent Loans). If Lucent chooses to convert its notes at the end of the Refinance Period, the Conversion Notes (a defined legal term) could carry a cash payment coupon as high as approx. 21% based on Winstar's current bond prices (i.e. a potential $62 M of additional interest cost annually on current $690 M of Lucent Loans)

*Option 2–Meet with Winstar immediately and advise verbally of pending notice*

Pros:

- Provides opportunity to negotiate right to sell up to $300 M of Lucent Loans today if Lucent desires;
- Advise of refinance amount of 100% of Lucent Loans then negotiate a lesser amount if Lucent desires;
- Flush out any strategic options currently under consideration by winstar;
- Extract other amendments (i.e. collateral, voting, assignments, etc.) and any

additional economic concessions (i.e. rate, fees, warrants)

- Limit public disclosure and market impacts

Cons:

- Time is of the essence
- 105 days required for refinance
- Rumors still may permeate the marketplace

### V. Conclusions:

- Lucent's ultimate negotiating position may be driven by our own perception of Winstar as a "going concern";
- If we believe they are a survivor than our primary concern might be limiting a loss of Lucent profits, i.e., discounting Lucent paper;
- To make the most informed Lucent decision we need better clarity from marketplace on capacity for Winstar debt/equity to make a more informed decision; A confidential discussion may begin immediately on this;
- Alternatively, do we perceive Winstar as completely locked out of the capital markets and absent a strategic investor? Should we be concerned about capital perservation and the impact to Lucent's balance sheet and credit rating?
- Ultimately our decision should be driven by where we think this is going. In our judgment, if the capital market disruption is temporary, i.e., 3–6 months longer; than [sic] Winstar is likely to survive.

68. By November 7, 2000 Lucent had apparently decided to delay issuing the refinancing notice when Beth Perricone again wrote in an email:

As you will see below there was a meeting of the minds at Winstar yesterday. Late last nite [sic] Bill Quinn and I spoke briefly to Peter for the outcomes

of that meeting. Peter described 3 capital events about to occur:

- Bank group to provide for new term loan of $200M to be supported via guaranty of Siemans. The proceeds of this loan are to paydown [sic] Lucent Apparently Winstar will enter into long term supply agreement w/Winstar [sic] in exchange for their guaranty. Not sure how they will pay for Siemans gear if that facility is used to repay us? ?
- Winstar to enter into new $275M capital lease w/Cisco
- Winstar to inject new $25M of equity (term sheet to follow to Lucent)

This would bring our current exposure of $690M down to $490M or below the trigger amount. I am not clear from Peter whether we will issue refinance notice now, sounds like we are waiting. Peter want complete due diligence done at Winstar so Quinn, Keller and I are coming up w/ a list today.... (PX 188).

69. On November 10, 2000 Perricone sent yet another email in which she again recommended that due diligence of Winstar be undertaken to evaluate the impact of a refinancing notice prior to send such a notice. (PX 189). Lucent was clearly worried that the issuance of the refinancing notice would have dire consequences for Winstar. (Hayes, Depo, Tr 13–45). Nevertheless Hayes assuredly wrote in a November 16, 2000 email to Hunt–Majean, "Sending the refinancing will not send Winstar into a financial 'tailspin,' and I will stake my bonus from this past year on it." [37] (PX 191).

70. In November 2000 Lucent commenced its due diligence of winstar's financial condition. As a result of the due diligence, Perricone recommended that Lucent lower Winstar's "Asset Quality Rating" or "ARQ" from 6 to 7.[38] (Perricone, Depo, Tr. 3–115).

71. Lucent replaced some of its key management in the fall of 2000 but it continued along a tumultuous path with employees in the sales and finance department continuing to have different goals and objectives. Although Lucent's upper management wanted to extricate the company from the business of lending to its customers, or at least from Winstar, the pressure to have Winstar continue purchasing and building out the network continued. Indeed when Winstar did not behave as Lucent wanted, Lucent simply shut down any discussion of a transition agreement. Lucent continued to control Winstar throughout the course of their relationship, including in December 2000. Although there may have been periods when Lucent's control was less apparent or even relaxed, and indeed there were times when Winstar was able to extract concessions from Lucent, the fact remains that these parties were not dealing at arms length. For example, the bill and hold transactions were done at the request of Lucent (PX 462 at Exhibit N);[39] purchase

---

37. Hayes testified that the comment about staking his bonus on his opinion that the refinancing notice would not send Winstar into a tailspin was intended as a joke as Lucent did not offer bonuses. (Hayes, Depo, Tr. 13–89).

38. The ARQ rated Lucent's borrowers on a scale of 1 to 10. The higher the rating, the higher the inherent risk of non-payment. (Perricone, Depo., Tr. 13–115).

39. PX 462 is the Report of Paul Pocalyko who was retained as an expert by Winstar to render an opinion as to whether the transactions were arm's-length and if Lucent exerted undue influence and control. Lucent sought to exclude Pocalyko's testimony under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Assuming for the sake of argument that *Daubert* is applicable in a bench trial, the Court denied the motion. (Tr. of March 16, 2005

orders are vague-often describing as "miscellaneous" a purchase of several million dollars (*See, e.g.,* PX 462 at Exhibit H and I); the inflation of the Software Pool Agreement from $31 million to $135 million over the course of a 9 day period (PX 462 at Exhibit P).[40] There were also excessive end of quarter deals, unneeded equipment paid for by Winstar but sitting in Lucent's facilities, duplicate charges, and difficulty, to say the least, in getting credits correctly to Winstar's accounts.[41] Winstar was and remained Lucent's captive purchaser of unneeded and sometimes unidentified goods to permit Lucent to inflate its own revenue.

72. By letter dated December 28, 2000 and addressed to Michael Montemarano, Lucent's Vice President of Finance of Worldwide Sales and Marketing, (DX 556),

Winstar sent Lucent a request to borrow $62,324,930.00.[42] Accompanying the letter was a one page "analysis" captioned:

Winstar Telecommunications, Inc.

Lucent Billing for Capital Labor

Q1 2001 Estimate

The chart lists the departments which provided the services under three general headings: "Winstar Systems Group," "Winstar For Buildings," and "Winstar Network Services." Each general heading is followed by a specific list of what appear to be the various departments which rendered services, along with the total of "internal," "external," and "Lucent billable" labor costs incurred by each department for the months of October, November, and

---

hearing at 34–41) [Docket 322]. Although the Court continues to believe its initial ruling is correct, it has used Pocalyko's report only as a convenient vehicle to refer to relevant documents. The Court has not relied upon Pocalyko's opinions in reaching its decision.

40. The Software Pool Agreement prices the equipment at "list" price rather than the reduced price that the Supply Agreement provides.

41. Although the parties disputed these allegations, after weighing the credible evidence, including the documents appended to and compiled as part of the Pocalyko Report, the Court finds that the Plaintiff has proved that Lucent essentially dumped excessive amount of unneeded equipment on Winstar in order to inflate Lucent's own revenues. For example, excluding the $135 million paid to Lucent under the Software Pool Agreement (which itself is another indication of the sham transactions Lucent devised to inflate its own revenues), Winstar made an aggregate of approximately $706,000,000 in purchases from Lucent in calendar years 1999 and 2000. During this period the amount of Lucent equipment paid for by Winstar but sitting in Winstar's or Lucent's warehouses continued to increase so that by March 31, 2001 there was, on an adjusted cost basis, approximately

$327 million in those warehouses. Of that $327 million in equipment, the overwhelming majority, indeed about $256 million was paid Lucent equipment while $71 million was non-Lucent merchandise. And needless to say, the valuation of the Lucent equipment at $256 million on an adjusted cost basis is less than that actual amount paid to Lucent by Winstar for that equipment.

Moreover closer examination of the facts relating to the warehoused equipment purchased from Lucent reveals that of the approximately $256,000,000 (on a cost adjusted basis) of Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, approximately $74 million of the $256 million of Lucent equipment could be specifically traced as to the original date that Winstar purchased such equipment from Lucent. Of that $74 million of Lucent equipment, approximately $36 million (on a cost adjusted basis) of that equipment was purchased by Winstar in a December 31, 1999, end of quarter bill and hold sale and remained in a Lucent warehouse undeployed for 15 months as of March 31, 2001. In fact once Winstar paid for Lucent equipment, it was not unusual for some of that merchandise to sit in a warehouse for more than a year.

42. The letter requests that the funds be wired to WCI Capital Corp.

December (for which month the figures are estimates) of 2000.

73. On the evening of December 27, 2000 Montemarano sent an email (included as part of PX 199) to several Lucent employees, including Ben Verwaayen, Lucent's Vice Chairmen; and Hopkins, Lucent's CFO, which reads in part as follows:

Based on a call today from winstar [sic] chairmen, president and CFO we took the following position as articulated by Ben. We could "allow" winstar [sic] to use the credit facility to fund their services for this quarter. We would not engage in any billing/po's between the companies, but they could and do intend to draw down the facility for about 65M [sic]. This is money out the door for us.

We agreed that the 35m [sic] credit granted in 4qtr can be used as a reduction to their outstanding credit facility. It would not be dispersed as cash to them, but we [sic] go against the credit facility as "repayment."

They also Indicated they had presented a draw down last week of 32M [sic], Ben asked them to reconsider this given the extremely low lucent [sic] content.

I will work this tomorrow with their CFO and plan to ensure they adequately document cash draws. In addition, Ben asked the CT [customer team][43] to set up a meeting with winstar to get the relationship to a new level where both companies benefit.

74. The next morning Lucent's CFO sent the following reply via email (also part of PX 199):

WE HAVE ALREADY SAID no TO THE SERVICES FUNDING.

75. A few hours later, Verwaayen emailed (also part of PX 199) the following:

Well, after a read out from the lawyers and after reviewing the options with everybody on our pre call yesterday, Winstar can draw down upon the credit facility, including services.

We did push back on credits (no cash, but off setting a/r's) and the 30 million request that came in Friday.

We really had not the option of denying their rights here.

In reality, we can make their lives miserable for a couple of days, but they have an open line and that is what we have to change.

So what we did, after all agreed in our pre call is to create a basis for a fundamental resetting of this relationship.

We will create from both sides a wishlist how to recreate our legal platform working together and renegotiate on those issues.

I think we all understand how much better we are and how to get out of this situation going forward.

We want to make this a profitable account with clear rules of engagement.

76. But as suggested in the December 29, 2000 email Ben Verwaayen sent, Lucent had used its influence over Winstar to set the stage for the new negotiations.

Now we have positioned ourselves for a major overhaul of our relationship with Winstar, I think we should involve our partners in treasury and Legal in preparing a model for our negotiations on Jan 9 or 10. . . . (PX 261).

77. On the evening of January 5, 2001, Elizabeth Perricone (who was not copied on the above series of emails) sent an email (PX 119) which reads in part:

*Financing of Services on 12/29/00:*
Given our agreement to finance services on 12/29/00, legal feels it would be pru-

43. Hayes, Depo, Tr. 13–63.

dent to send Winstar a letter confirming this was a borrowing under the Credit Agreement as an accomodation [sic], and we reserve the right not to make loans for any such purpose in the future.

78. On March 27, 2001 Winstar faxed to Lucent a notice of Winstar's request to borrow $62,050,743.00 effective March 30, 2001. (DX 668). The draw request is on Winstar letterhead and is captioned "Notice of Request for Borrowing." The Notice states that the request is given "[p]ursuant to Section 2.03 of the Credit Agreement" and contains a certification "that all conditions for borrowing set forth in Section 4.03 the [sic] Credit Agreement have been satisfied or will be satisfied as of the date hereof and as of the date the borrowing is made." The Notice also indicates that the entire amount requested is to be paid to the "Borrower" for non-Lucent equipment.

79. On April 2, 2001 Winstar sent Lucent a second fax that contained the backup detail to the Notice of Request for Borrowing (included as part of DX 668). The cover sheet contains the following note: "Please add this to the draw request as an attachment. Although this is not usually provided, this is the detail behind the services number." The detail attached is a one page chart that is captioned:

Winstar Telecommunications, Inc.

Lucent Billing for Capital Labor

Q1 2001 Estimate

The chart is virtually identical to the one attached to the fourth quarter 2000 request except that this request is for the months of January, February, and March (for which the figures are estimates) of 2001. The total of all of these costs is approximately $62,050,742.[44]

80. Lucent refused to pay citing the lack of a task order. The lack of a task order was simply a ruse, however. Lucent had not required task orders in the past and, although Aversano's September 27, 2000 letter purported to set new parameters for payment, Aversano's letter extorted Winstar's assent to the reset terms by threatening nonpayment. Even Lucent's own executives testified that the documentation submitted by Winstar created a "commercially binding relationship" for the relevant time periods: "[a]t September 30th [2000], we clearly were in a relationship that was commercially binding because there were purchase orders and invoices between the companies where we subcontracted with them." (Montemarano, Video-direct at 10–11; see also Montemarano, Video-direct 68:8—69:24; Simpson, Video-direct at 18–54).[45]

81. Although, beginning as early as the communications surrounding the invoice for the second quarter of 1999, Lucent warned Winstar that it would pay for Wireless' services "one last time" without a task order, there were too many "one last times" for that warning to be effective. (See Aversano's letter of September 27, 2000; December 27, 2000 call between Lucent and Winstar) (Wilson, Tr. 16–110–11). Moreover, privately Lucent employees agreed that Lucent was obligated to pay for these services. As is discussed in greater detail below, Lucent was using the threat of non-payment to get Winstar to

**44.** This figure was calculated by the Court; the numbers listed on the line called "Grand Total" are unreadable on the exhibit. Some of the numbers throughout the exhibit are difficult to read but the total appears to be within $1 of the amount requested in the Notice of Request for Borrowing.

**45.** The transcript of Montemarano's deposition testimony is Joint Trial Exhibit 9; the transcript of Simpson's testimony is Joint Trial Exhibit 11.

renegotiate their various agreements to get a better deal. On repeated occasions, Lucent advised Winstar that it was paying for Wireless' services under the Subcontract "one more time" or "one last time" but always paying each invoice until March 2001 when Lucent was again trying to turn up the heat to get a better deal from Winstar. (Wilson, Tr. 16–110–11).

■ 82. The requirement that there be "task orders" as contemplated by the Subcontract was modified by the course of conduct between the parties.

■ 83. Lucent argues that this course of conduct between the parties is irrelevant because the Subcontract contains a "no oral modification" clause. Although such clauses are generally enforceable under New York law, there are two exceptions: (1) where an oral modification is supported by full performance, or by partial performance unequivocally referable to the oral modification, *Rose v. Spa Realty Associates*, 42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279 (N.Y. 1977), and (2) where a party has relied upon an oral modification through conduct which is incompatible with the express terms of the contract, equitable estoppel will prevent the other party from attempting subsequent strict reliance on the written terms. *Id.*, 42 N.Y.2d at 344, 397 N.Y.S.2d at 927.

■ 84. "Under New York law, oral directions to perform extra work, or the general course of conduct between the parties, may modify or eliminate contract provisions requiring written authorization or notice of claims." *Barsotti's, Inc. v. Consolidated Edison Co. of New York, Inc.*, 254 A.D.2d 211, 212, 680 N.Y.S.2d 88, 89 (1998) (internal quotations and citations omitted). When the contract has not been fully performed, "the party seeking relief from the written terms of the contract must introduce evidence of conduct on the part of other parties or reliance on his own part which is 'unequivocally referable' to the oral modification and incompatible with the contract's written terms." *Rose*, 42 N.Y.2d at 341, 344, 366 N.E.2d at 1281, 1283, 397 N.Y.S.2d at 924, 927. "Because the doctrine of part performance is based upon the equitable principle that it would be a fraud to allow one party, insisting on the Statute [of Frauds], to escape performance after permitting the other party, acting in reliance, to substantially perform, the acts of part performance must have been those of the party insisting on the contract, not those of the party insisting on the Statute of Frauds." *Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group PLC*, 93 N.Y.2d 229, 237, 711 N.E.2d 953, 958, 689 N.Y.S.2d 674, 679 (1999).

85. In this case the parties' behavior resulted in a modification to the Subcontract. There can be no question that Wireless' performance was undertaken pursuant to the Subcontract. Based upon Lucent's past practices, neither Wireless nor Winstar was unreasonable in relying upon Lucent's practice of funding and paying for services upon presentation of an invoice and spreadsheet and neither was unreasonable in expecting this practice to continue. Moreover, it is not credible that almost two years after the pattern had been established that Lucent would insist upon compliance with the letter of the Subcontract, particularly when Lucent has used this tactic in the past to try to pressure Winstar and when Lucent itself was dragging its heels on negotiating the long-awaited transition agreement. In fact, after Lucent forced Uhl, under threat of non-payment of the Winstar's September 8, 2000 invoice in the amount of $65,509,331, to sign Aversano's September 27, 2000 letter (PX 88) purportedly resetting the terms and conditions of the Sub-

contract, Lucent ignored the reset terms the very next quarter. Therefore based on the parties' behavior, the Subcontract was modified to provide for payment of purchase orders, invoices, etc. after the Wireless performed the work and thus Lucent's refusal to pay the March 2001 invoice was in breach of the Subcontract.

86. The Trustee is awarded damages in the amount of $62,050,742.00, the amount of the March 2001 invoice which Lucent was obligated to, but did not, pay. Pursuant to the law of this case, no consequential or punitive damages are awarded in connection with the breach. (*See* Docket # 85 and # 103). Moreover the parties have agreed that, if the event that the Trustee should be awarded damages pursuant to this Count, Lucent would be entitled to an offset of $6.3 million. Therefore the damage award is reduced to $55,750,742.00.

## COUNT X: PREFERENCE

87. Section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b), provides in relevant part as follows:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

\* \* \* \* \* \*

(B) between ninety days and one year before the date of filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

88. The burden of proving each of these elements by a preponderance of the evidence is on the chapter 7 Trustee. 11 U.S.C. § 547(g). *Official Committee of Unsecured Creditors v. Conceria Sabrina,* 195 B.R. 602, 612 (Bankr.M.D.Pa.1996).

89. In November 2000, with Lucent and Winstar still in negotiations on a transition agreement, Winstar informed Lucent that Siemans agreed to join the Bank Facility and lend Winstar an additional $200 million.

90. Prior to the closing of the Siemans loan, Winstar sought Lucent's permission to keep all, or failing that, $100 million of the loan and pay the other $100 to Lucent even though the Second Credit Agreement called for 100% of the proceeds of any increase in the Bank Facility to be paid to Lucent. Lucent refused and responded with a letter dated November 7, 2000 "consent letter" that was merely a list of demands. Those demands included the following:

A. First, Lucent demanded that Winstar draw all of the funds down as soon as they were available and pay them to Lucent, rather than allowing Winstar to determine whether and when it would tap the facility.

B. Second, Lucent demanded that Winstar agree to prepare a written pay-down schedule for the remainder of the sums it owed Lucent under the Second Credit Agreement—even though Winstar was not obligated even to begin repaying the sums until 2005—and insisted that

Winstar help Lucent sell off the other outstanding Winstar borrowings.

C. Third, Lucent required that Winstar cooperate in Lucent's performing a due diligence review of Winstar.

91. When Winstar did not immediately agree to Lucent's demands, Lucent put the transition agreement negotiations on hold. Lucent's communications to Winstar were clear and carried the single message: agree to Lucent's demands or there would be no transition agreement.

92. When Winstar still did not acquiesce, Lucent played its ultimate trump card: give Lucent all of the Siemans proceeds or there would be no further draws under the Second Credit Agreement. Lucent, of course, could not withhold funding without breaching the Second Credit Facility. Lucent's threat was one more ploy to control Winstar.

93. Faced with the economic pressure, Winstar agreed to turn over the Siemans proceeds and on December 7, 2000 closed on a $200 million increase to its syndicated loan with Bank of New York.

94. On the same day Winstar paid, by wire transfer, Lucent $188,180,000 to reduce Winstar's outstanding loan with Lucent. This transfer represented the net loan proceeds of $194 million minus $5,820,000 refund of an up-front fee Winstar had paid Lucent at the time of the borrowing under the Second credit Agreement.

95. Lucent disputes that a transfer of Winstar's interest in property was made, that Winstar was insolvent at the time of the Transfer, and that Lucent was an insider of Winstar at the time of the Transfer.

### Transfer of the Debtor's Interest

96. Lucent waived the argument that there was not a transfer of Winstar's interest when it agreed to the following stipulated fact set forth in paragraph 6 of the Additions to Stipulated Facts, filed in open court on March 21, 2005:

> Section 547(b)(1) of the United States Bankruptcy Code has been satisfied with respect to the Trustee's claim that the transfer to Lucent of a portion of the Siemens loan proceeds constituted a voidable preference.

97. Subsequently, after the Trustee had rested, Lucent argued its motion for partial findings under Fed. R.Civ.P. 52(c), incorporated by reference into Fed. R. Bankr.P. 7052, and asserted for the first time that the Trustee had not sustained her burden of proving that section 547(b)(1) had been satisfied. (Tr. 17-7). Having stipulated that this element has been satisfied, Lucent is not free to take back the stipulation after the Plaintiff concluded her case. But lest Lucent argue that the stipulated fact which, to the Court, is clear on its face is somehow ambiguous or means something other than what is says, the Court finds that even without the stipulation, there is more than ample evidence that a transfer of Winstar's interest in property occurred when it paid over a portion of the Siemens proceeds to Lucent. As Judge Fitzgerald recently stated in *In re AmeriServe Food Distribution, Inc.*

> Section 547(b) requires, inter alia, that the property transferred by the debtor be an "interest of the debtor in property." The Supreme Court has interpreted this to be "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). In determining whether a transfer was "an interest of the debtor in property," courts apply the "diminution of estate doctrine," under

which a transfer of an interest of the debtor occurs when a transfer "diminish[es] directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts, to such an extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one." *In re Superior Stamp & Coin Co. Inc.*, 223 F.3d 1004, 1007 (9th Cir.2000), quoting 4 Collier on Bankruptcy, ¶ 547.03, at 547–26 (15th ed.1993). *AFD Fund v. Transmed Foods, Inc. (In re AmeriServe Food Distribution, Inc.)*, 315 B.R. 24, 29 (Bankr.D.Del.2004).

98. But for the payment over to Lucent that Debtor would have had the use of those funds. That the failure to pay Lucent upon completion of the refinancing with Siemens might have given rise to a claim by Lucent for breach of contract does not nullify the fact that a transfer of the Debtor's interest was made.

99. Lucent further attempts to couch this argument as one of "substitution," that is, Siemens was substituted for Lucent on that portion of the loan it made. This argument is factually incorrect. By Lucent's own admission, its collateral pool was different from that given the Siemens. The Siemens transaction was not simply the substitution of one lender for another. Viewed another way what Lucent is really arguing is, as the Trustee correctly notes, the so-called "earmarking doctrine." Under this theory Lucent argues that Winstar had no ability to divert a vast majority of the Siemens proceeds away from Lucent. Thus, Lucent asserts Winstar had no interest in the proceeds and was somehow simply a conduit through which the money flowed. But the facts here are distinguishable from those cases in which debtors validly assign proceeds before they are acquired. Here there was no assignment, just a simple promise to pay. That contractual obligation, without more, is insufficient to convert this into an assignment. *Compare In re Computer Engr'ng Assocs., Inc.*, 337 F.3d 38 (1st Cir.2003) (valid assignment of contract proceeds meant that debtor had no interest in proceeds as they accrued); *In re RISCmanagement, Inc.*, 304 B.R. 566 (Bankr.D.Mass.2004) (valid assignment of contract proceeds would deprive debtor of any interest in that property, but mere agreement to pay creditor out of contract proceeds would not). Moreover there is nothing in the record evidencing an agreement between Siemans and the Debtors that the proceeds of the Siemans transaction be used to pay Lucent. *See Reigle v. S.S. Mahajan (In re Kumar Bavishi & Associates)*, 906 F.2d 942, 944 (3d Cir. 1990) (affirming preference where "record does not reflect the existence of an agreement between [new creditor] and the debtor that the funds be used to pay a specified antecedent debt"); *In re Bohlen Enters., Ltd.*, 859 F.2d 561, 566 (8th Cir.1988); *Howdeshell of Fort Myers v. Dunham–Bush, Inc. (In re Howdeshell of Fort Myers)*, 55 B.R. 470, 474–75 (Bankr. M.D.Fla.1985) (rejecting earmarking where debtor decided who to pay, and third party did not "condition" loan on payment to defendant).

100. Finally, earmarking is an affirmative defense. Lucent did not raise it in its Answer or in the Joint Pretrial Memorandum. Thus, even if Lucent had not previously waived the issue in the Additional Stipulated Facts, and even if it had proved facts that bring the Siemens proceeds under the doctrine of earmarking, it waived the defense when it failed to plead it as an affirmative defense.

*Insolvency*

101. Under the Bankruptcy Code

"insolvent" means—(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of— (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title . . . .

11 U.S.C. § 101(32).

▮▮▮▮ 102. This test of insolvency, the so-called "balance sheet" insolvency, compares the "fair value" of all of the debtor's assets with the face or "stated" value of its liabilities on the relevant date. It is different from equity tests that focus on a debtor's current ability to pay debts as they become due. Moreover, although labeled as the "balance sheet" test, as Judge Wairath noted "this may be a misnomer because the Balance sheet Test is based upon a fair valuation and not based on Generally Accepted Accounting Principles ('GAAP'), which are used to prepare a typical balance sheet." *Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 540 (Bankr. D.Del.2002). "[A]lthough GAAP is relevant in [a] section 547 solvency analysis, it is not determinative." *Id.* at 542. "Whether a company is insolvent under the Bankruptcy Code is considered a mixed question of law and fact." *In re Trans World Airlines, Inc.*, 134 F.3d 188, 193 (3d Cir.1998).

*Fair Valuation*

103. There are three standard approaches to determine the fair value of assets: the market approach, the income approach and the asset approach. (Scherf, Tr. 12–12–13 and 23–24). Although experts generally consider each of these approaches (Scherf, Tr 12–13), not all of the approaches are appropriate or helpful in determining the proper measure of valuation. Indeed valuation, although employing broad principles of economics, is as much an art as it is a science. Each approach may yield a different result and which approach offers the best or better framework is a determination made in light of the facts of a case. Nevertheless there are some basic tenets that guide courts in evaluation valuation evidence.

104. Fair valuation is generally interpreted as fair market value, that is the amount a hypothetical willing buyer would pay to a willing seller, rather than a distressed or liquidation value. *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 194 (3d Cir.1998), *cert. denied,* 523 U.S. 1138, 118 S.Ct. 1843, 140 L.Ed.2d 1093 (1998).

▮▮▮▮ 105. "[A] fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time." *Id.* Although the determination of what is a reasonable period of time depends upon the facts of each case, a "reasonable time should be an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price." *Id.* at 195. Thus the Court must decide whether "fair value" under the facts of this case means that the Debtor's assets at the time of the transfer must be valued as a going concern or on some other basis, such as a liquidation sale. The answer depends on whether a liquidation in bankruptcy was "clearly imminent on the date of the challenged trans-

fer...." *Id.* at 193. *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127, 131 (Bankr.D.Mass.1989)("The proper standard of valuation to be applied in determining solvency in a bankruptcy proceeding is the value of the business as a going concern, not the liquidation value of its assets less its liabilities.... Liquidation value is appropriate, however, if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic...."). Moreover "going concern" value may not be an appropriate test in an unstable market. *In re Art Shirt, Ltd.,* 93 B.R. 333 (E.D.Pa. 1988).

106. As Lucent's insolvency expert noted in his report:

> During the 1999–2000 period telecom stocks exhibited a great deal of volatility. According to Merrill Lynch, during the period from January 1, 1999 to early March 2000 an average stock within the emerging broadband group appreciated 63% year to date, then these stocks declined an average of 87% by the end of 2000.

(DX 701 at 11).

107. The traditional method of determining " 'going concern' value is by capitalizing net profit." *Vadnais Lumber Supply,* 100 B.R. at 131.

108. The Trustee and Lucent each rely upon the testimony of their respective insolvency experts and not unexpectedly those experts reached vastly different conclusions. The Trustee's expert, Scherf, concluded that Winstar was insolvent on December 7, 2000, the date of the transfer; Collins, Lucent's expert, concluded the Debtor was solvent on that date.

109. Stephen J. Scherf, the Trustee's expert, is a Certified Public Accountant and a Certified Valuation Analyst. He is a principal in Parente Rudulph, LLC and is well qualified to render an expert opinion in the area of insolvency. Lucent does not dispute his qualifications as an expert in this matter. Scherf's report was admitted into evidence as PX 460.

110. Lucent relied upon the expert opinion of Kevin Collins, a managing director of Houlihan Lokey Howard & Zukin and in charge of the valuation practice of the firm's New York City office. He is also well qualified to render an expert opinion in the area of insolvency and the Trustee does not dispute his qualifications as an expert in this matter. His report was admitted into evidence as DX 701.[46]

111. In this case the Trustee's expert considered all three approaches (Scherf, Tr. 12–24–25), while Lucent's expert did not consider the asset approach (Collins, Tr. 18–16).

*The Market Approach*

112. The market approach measures the subject company's assets and those of similarly situate companies.

113. Collins testified that "there was a large and active trading market for Winstar...." (Collins, Tr. 18–16). He opined that the market approach or an income approach would be the appropriate tests for valuation. Because the market approach considered the value only on the basis that the purchaser could only acquire a minority ownership interest via stock purchases, he then adjusted the value up-

---

**46.** Both experts have substantial experience testifying as experts. Both have had courts accept their opinions as correct; both have had their opinions criticized. Because the Court must determine solvency in light of the unique facts of *this* case, criticism by another court of the methodology chosen by either expert in a different factual context has limited value.

ward to include the increase in value that could be attributed to buying a controlling, or indeed entire, interest in the Debtors. Based upon his analysis, he opined that Winstar was solvent on the Transfer date.

114. Scherf rejected the stock market valuation of Winstar and he was correct to do so. The stock market value artificially overvalued the Debtor. For one thing market investors did not know that Lucent was holding back on issuing its refinancing notice. Lucent, but not the average investor, knew that Winstar's true financial picture was much bleaker than the Debtors' publicized financials would indicate. Moreover, as even Collins acknowledged, the market was unstable. [cite] It was simply too unstable to be an adequate indicator of valuation.

115. Moreover, as part of his market approach, Collins, blending a market approach with principles upon which the income approach is based, examined sales of companies or controlling interest in companies that were not comparable to Winstar in performing a guideline company approach and comparable transaction methodology.

*The Asset Approach*

116. Scherf and Collins both utilized an asset approach to value Winstar. This approach looks at categories of assets and determines the fair market value of those assets or categories of assets based on what it would cost to replace or reconstruct the assets, that is, their replacement cost. (Scherf, Tr. 12–24 and PX 460 at 6). This approach generally begins with a company's balance sheet but substitutes the fair market value of assets and liabilities in place of the book value.

117. The date of the transfer, in this case December 7, 2000, is the relevant date for solvency. The Debtors, however, did not have financial statements as of that date, and, even if they had, financial statements prepared according to GAAP, although relevant, are not controlling. The Debtor did, however, have internally prepared financial statements for December 1, 2000 and December 31, 2000. Thus one approach to determining solvency as of December 7, 2000 is to begin with the financial statements of December 31, 2002 and apply a technique commonly referred to as retrojection. "[T]he United States Court of Appeals for the First Circuit has expressly approved the technique of retrojection, whereby a trustee may meet his burden of proof on the issue of insolvency by showing that the debtor was insolvent at a reasonable time subsequent to the alleged transfer, accompanied by proof that the debtor's financial situation did not change materially during the intervening period." *In re Industrial Commercial Elec., Inc. v. Babineau ( In re Industrial Commercial Elec., Inc.)*, 2004 WL 1354530, *7 (Bankr.D.Mass.) (citations omitted). There is no reason to believe that this technique, employed by both parties' experts, would not be expressly approved by the Third Circuit as well. "That rule [retrojection] provides that when a debtor was insolvent on the first known date and insolvent on the last relevant date, and the trustee demonstrates 'the absence of any substantial or radical changes in the assets or liabilities of the bankrupt between the retrojection dates,' *id.*, the debtor is deemed to have been insolvent at all intermediate times. *Foley v. Briden (In re Arrowhead Gardens, Inc.)*, 32 B.R. 296, 300 (Bankr.D.Mass.1983)." *Murphy v. Nunes (In re Terrific Seafoods, Inc.)*, 197 B.R. 724, 731 (Bankr.D.Mass.1996).

118. There were no contemporaneously prepared audited financials for the year ended December 31, 2000. Winstar's unaudited financials for that time showed Winstar had a positive net worth *on a book value basis*. (PX 460 at 10). Book value

is not the same as fair value.[47] If Winstar's net worth is evaluated on an income basis, it had a negative value.

119. Scherf identified four subsequent events he believed had to be accounted for in order to apply the asset approach: (1) the recognition and recording of a $1.8 billion impairment charge for the three months ended December 31, 2000 by Grant Thorton, LLP, the Debtors' independent auditors; (2) the sale of substantially all of the Debtors' assets and nor of their liabilities to IDT for $42.5 million on December 19, 2001;[48] (3) the valuation prepared for IDT in connection with the allocation of the purchase price; and (4) the administrative insolvency of the Debtors' estates, a factor which he ultimately determined did not provide evidence of solvency or insolvency on the Transfer Date. (Scherf, Tr. 12–25).

120. The impairment charge was based on projections that were prepared for a presentation on December 11, 2000. The impairment charge was clearly knowable on December 7, 2000. (Scherf, Tr. 12–33).

121. In February 2001 Monoco sent an email documenting Winstar's cash flow problems.-Monaco's email in Feb 2001 re: "Depending on the time of checks clearing, we will have difficulty getting to the end of March when we anticipate a brief reprieve by receiving $60mm from Lucent for services, etc." (PX 284). By March 30, 2001

Uhl recognized Winstar's need to file bankruptcy. (Uhl Video-direct at 242–43).

122. Valuations were prepared for IDT in connection with the December 19, 2001 sale by Deloitte & Touche, which valued just the tangible assets at $328 million, and Empire Valuation, after reviewing the work of Deloitte & Touche, determined that the tangible and intangible assets were worth $630 million.

123. Based upon his analysis, Scherf opined that Winstar was insolvent by approximately $1.6 billion on the Transfer Date. The Court agrees.

124. Lucent criticizes any reliance upon the actual sale price ultimately paid for Winstar's assets during its bankruptcy. It argues this number represents a distress sale and a price significantly less than Winstar's value on December 7, 2000. The sale price, although not the only or even the primary fact upon which Scherf's valuation is based, is relevant. Contrary to Lucent's characterization of the sale of Winstar's assets, the sale was not an auction but rather as a going concern. *See, e.g.,* Order Authorizing Sale [of substantially all assets to IDT], dated December 19, 2001 at M (entry of sale order necessary to provide uninterrupted service to Debtors' customers) [Docket # 1627]; Master/Final Execution Copy of Asset Purchase Agreement [Docket # 1629].

---

**47.** In fact one indication of how poorly Winstar's book value reflected that actual market value of its assets is the optronics inventory. Because Winstar had purchased unneeded equipment from Lucent, including optronics equipment, when Winstar's financial condition was deteriorating in the fall of 2000, it made plans to institute some measures to improve its financial condition. *See* PX 68. One of those measures included selling off excess equipment, including the optronics equipment. (Kantor Video-direct at 479). But the only offer Winstar received for its excess optronics equipment came from Lu-

cent, and it was at a reduced price. *See* PX 22 (Uhl's 12/14/00 email to Frank Jules, Fred Rubin and Nate Kantor: "Guys[,] Carole Spurrier and Debbie Harris called at 4:30 to inform as follows:...5. They have found no buyer for the Optronics. Their internal remarketing group offered to buy it at $.30 on the $1.00. (I said no thanks).").

**48.** The purchase price was paid as follows: $30 million in cash and $12.5 million in IDT Class B stock. (Scherf 12–34; PX 460 at 10).

*The Income Approach*

125. The income approach estimates the value of a company based on its earnings capacity. (PX 460 at 7). There are two commonly used methods to conduct income approach valuation. The first, capitalized debt free method also called capitalization of earnings, is based on a company's debt free net cash flow for one year or some other discreet period. Winstar never had any debt free cash flow. In fact Winstar, which began its operations in 1996, lost $83 million in that year. The losses steadily increased and by 2000 the loss had grown to $870 million. Thus application of this method mandates a finding of insolvency.

126. Under the second method, the discounted cash flow method, future earnings are projected and then discounted to present value, adjusted to reflect the risk that such earnings will not materialize. (PX 460 at 8). Winstar in fact had prepared projections for a ten (10) year period, until 2009. Because of Winstar's historical performance and the instability of the telecommunications industry, Scherf concluded the Winstar was insolvent using this method. His conclusion is correct. Those projections were speculative at best. They included growth rates significantly in excess of what was projected to be reasonable growth in the telecommunications industry. Moreover, while Winstar generally had been able to meet its revenue projections-although the ten year projections through 2009 relied heavily upon equity infusion which may or may not materialize in an unstable market, historically it understated its expenses. Finally the balance sheet for December 31, 2000 in actuality differed significantly for what Winstar had projected.

127. Collins ignored the deficiencies inherent in Winstar's projections; instead he accepted them at face value and thus his reliance on them produced a flawed result. Further he used a discounted rate of 16% to reflect the risk to investors at a time when Winstar's debt yield was in the range of 25–30%.

128. But Lucent argues that Scherf ignored contemporaneous cash flow data and future projections (which would be used to perform a valuation based on the discounted cash flow method) when performing a valuation based on the income approach and instead relied upon the capitalized debt free net cash flow method. Lucent is incorrect. The capitalized debt free net cash flow method is supported by valuation treatises and has been adopted by courts. Moreover, Scherf did not ignore the discounted cash flow method but rather rejected its use in this case given the unreliability of Winstar's future projections. The discounted cash flow methodology is simply an unacceptable method to be used in this case.

*Amount of Liabilities*

129. Absent some unusual circumstances not applicable here, the insolvency test anticipates that liabilities will be valued at their face value. *In re Trans World Airlines, Inc.*, 134 F.3d 188, 197 (3d Cir.1998).

130. Scherf values those liabilities at $4.8 billion as of December 7, 2000 (Tr. 12–14–15, PX 460); Collins did not value them as of that date. (Tr. 18–118). In fact Collins testified that he was unable to value the liabilities as of December 7, 2000. (Tr. 18–119). He valued the liabilities as of December 31, 2000 at $4.321 billion. (Tr. 18–118).

131. Based upon the valuation of the assets and liabilities, Winstar was insolvent on December 7, 2000, the date of the Transfer.

## Insider Status

132. Because the Transfer occurred during the period greater than 90 days before the Petition date but less than one year prior to the bankruptcies, the Trustee may only recover on her preference claim if she proves that Lucent was an insider at the time of the Transfer.

133. With respect to a corporation, an insider includes a "person in control of the debtor." 11 U.S.C. § 101(31).

134. Some courts have defined control as the creditor dominating the debtor. *In re A. Tarricone, Inc.*, 286 B.R. 256, 265 (Bankr.S.D.N.Y.2002). Others "have used terminology such as having a 'stranglehold' over the debtor, having 'complete domination' of the debtor, rendering the debtor a 'mere instrumentality or alter ego' of the lender or 'powerless to act independently.'" *Badger Freightways, Inc. v. Continental Ill. Nat'l Bank & Trust Co. Of Chicago (In re Badger Freightways, Inc.)*, 106 B.R. 971, 981–82 (Bankr.N.D.Ill.1989)(internal citations omitted).

135. Both Lucent and the Trustee correctly note that whether a party is or was "in control" of a debtor requires a case by case determination. "The legislative history of § 101(31) indicates that the term applies to 'one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.'" *Official Committee of Unsecured Creditors v. Austin Financial Services, Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 511 (Bankr. S.D.N.Y.1999) (quoting S.Rep. No. 989, 95th Cong., 1st Sess. 25 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5810, 6269) (legislative history 11 U.S.C. § 101(31)) (other citations omitted). "The true test of 'insider' status is whether one's dealings with the debtor cannot accurately be characterized as arm's-length. *In re Craig Systems Corporation*, 244 B.R. 529, 539 (Bankr.D.Mass.2000). The emphasis is on the nature of the relationship between debtor and the other person, especially on whether their relationship gave the other person the power or influence to have a debt owed to it repaid." *In re Demko*, 264 B.R. at 408.

136. In determining whether a creditor, and particularly a bank, has the requisite level of control to be an insider, the courts examine whether the creditor had more ability to assert control than the other creditors, whether the creditor made management decisions for the debtor, directed work performance, and directed payment of the debtor's expenses. *ABC Elec. Serv. Inc. v. Rondout Elec., Inc., (In re ABC Elec. Serv. Inc.)*, 190 B.R. 672 (Bankr.M.D.Fla.1995). *There must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake.*

*In re Armstrong*, 231 B.R. 746, 749–50 (Bankr.E.D.Ark.1999).

137. That does not mean, however, as Lucent asserts that Lucent must have used its control to obtain the transfer although whether the transfer in question was done under pressure from Lucent is one fact to be considered in making the determination of control. *Walsh v. Dutil (In re Demko)*, 264 B.R. 404, 408 (Bankr. W.D.Pa.2001). Neither the Bankruptcy Code nor the case law, however, require the use of the insider's status as an insider to force the preferential payment to be made. The elements of a preference are set forth in Section 547(b) which requires, among other things, that the transfer have been made "between ninety days and one year before the date of filing of the petition, if such creditor at the time of such

transfer was an insider...." 11 U.S.C. § 547(b)(4)(B). There is nothing in the language that requires the causal connection between the control and the preferential transfer that Lucent claims is needed.

138. In this case the facts indicate that Lucent controlled many of Winstar's decisions relating to the buildout of the network. Lucent forced the "purchase" of its goods well before the equipment was needed and in many instances under the Software Pool Agreement, never needed at all. Lucent treated Winstar as a captive buyer for Lucent's goods. These purchases, especially those under the Software Pool Agreement were just a means for Lucent to inflate its own revenue.

139. Lucent argues, however, that Winstar is complicit in its scheme to inflate revenues. For example when Lucent required Winstar employees to sign false bill and hold letters needed for Lucent to book revenue, they did so even though Winstar knew that Lucent used the process to deceive its auditors. That Winstar was a participant in Lucent's scheme does not prove that Winstar was not under Lucent control. In fact, Lucent's ability to involve Winstar's employees in Lucent duplicity is further evidence of Lucent's control.

140. Two former Lucent employees, Deborah Harris and William Plunkett refused to answer deposition questions beyond providing their names and addresses and instead asserted their right against self incrimination.[49] "The Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). This Court may and chooses to draw negative adverse inferences from their testimony. Both were employees of Lucent when the relevant actions occurred.[50] Although neither is a party to this lawsuit, a fact which Lucent emphasizes to show that neither "cared whether Lucent succeeds in this litigation," their non-party status does not render admitting their testimony impermissible given the facts of this case. Nor does the fact that neither was employed by Lucent when their testimony was taken. *Rad.* Both Harris and Plunkett were parties to the SEC's action (PX 739); both were employed by Lucent during the rele-

**49.** Prior to trial the Trustee sought a ruling that the Court could draw an adverse interest from Harris' and Plunkett's silence while Lucent disputed that their testimony was relevant and otherwise corroborated. It also argued that the questions posed to these two individuals were too specific thus rendering the examinations unfair. The Court granted the Trustee's motion but noted that it would revisit the issue after hearing the evidence upon Lucent's request. *See* Transcript of March 16, 2005 hearing [docket # 322] at 59–62. Having revisited the issue, the Court concludes that its initial ruling was correct for the reasons set forth herein.

**50.** There is no dispute that Harris and Plunkett were employed by Lucent during the time when the events at issue in the specific questions which the Court finds that they would

have answered adversely had they answered the questions honestly. Ms. Harris answered questions during her 2001 deposition and at the time testified she was employed by Lucent as the Vice President of Sales for the Winstar account beginning in August 2000. (Harris, Depo, Tr. 11–34). She also testified that William Plunkett the Vice President of Emerging Markets and was a member of Lucent's management team responsible for the Winstar account. (*Id.*). Mr. Plunkett was placed on administrative leave by Lucent in late November 2000 and was terminated shortly thereafter. (Wilson, Tr. 16–11). His termination was a direct result of his involvement in postdating documents relating to the Software Pool Agreement. (Schacht, Tr. 21 at 35). Both Harris and Plunkett reported to Nina Aversano.

vant time frame and the questions they refused to answer related directly to their actions as Lucent employees during this period.

141. Before an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege. *See Baxter*, 425 U.S. at 318, 96 S.Ct. at 1558. ("the Fifth Amendment does not forbid adverse inferences against parties ... when they refuse to testify in response to probative evidence offered against them"); "[L]iability should not be imposed based solely upon the adverse inference." *United States v. Private Sanitation Industry Ass'n*, 899 F.Supp. 974, 982 (E.D.N.Y.1994), aff'd 47 F.3d 1158 (2d Cir.), *cert. denied sub. nom., Ferrante v. United States*, 516 U.S. 806, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995).

142. During his deposition Mr. Plunkett was asked a series of questions relating to end of quarter deals, sham bill and hold transactions, the Software Poll Agreement. He asserted his Fifth Amendment privilege in response to each question but had he responded truthfully, his testimony would have added to the substantial evidence against Lucent and indeed would have been devastating to his former employer. Examples of the questions asked of this witness are set forth below.

Q: Isn't it a fact that in 1999 and 2000 you participated in transactions between Lucent and Winstar at the end of each quarter form December 31st, 1999 through September 30th, wherein Winstar purchased substantial quantities of equipment, software, and/or services from Lucent Technologies?

A: "On advice of counsel I respectfully decline to answer on the ground that my answer may incriminate or tend to incriminate me." (Hereinafter referred to as "Fifth Amendment Response").

Q: Isn't it a fact that in December 1999 Winstar purchased over $96 million worth of goods and services from Lucent?

A: Fifth Amendment Response

Q: Isn't it a fact that this transaction was referred to as an end of quarter deal?

A: Fifth Amendment Response

Q: Isn't it a fact that certain of the equipment purchased by Winstar in the December 1999 end of quarter deal was not delivered to Winstar but was held by Lucent even through the purchase price was paid by Winstar?

A: Fifth Amendment Response

And isn't it a fact that in connection with the end of quarter deal and in order to be certain that Lucent could book the revenue Lucent prepared letters which it gave to winstar which it asked Winstar to sign?

A: Fifth Amendment Response

Q: Isn't it a fact that Winstar did, in fact, sign the letters provided by Lucent with respect tot he December 1999 end of quarter deal?

A: Fifth Amendment Response

Q: And isn't it, in fact, correct that these letters were not true and correct in all respects?

A: Fifth Amendment Response

Q: Isn't it a fact that these letters falsely stated dates by which Lucent would install the purchased equipment?

A: Fifth Amendment Response

Q: And isn't it a fact the Winstar did not need the equipment purchased through these letters immediately but was buying the equipment earlier to provide Lucent with additional revenue?

A: Fifth Amendment Response

Q: And isn't it a fact that the letters also stated falsely that Winstar lacked the warehouse space to store equipment?

A: Fifth Amendment Response

Q: Isn't it a fact that some of the equipment purchased by Winstar in the December 1999 end of quarter deal included Optronics equipment?

A: Fifth Amendment Response

Q: And isn't it a fact that when your employment with Lucent terminated in November of 2000 this equipment remained in Lucent's warehouses?

A: Fifth Amendment Response

(Plunkett, Deposition transcript at p. 11, line 25 to p. 14, line 23).

143. He was then asked virtually identical questions with respect to March 2000, June 2000 purchases, and September 2000 end of quarter purchases and again asserted his Fifth Amendment privilege. (*Id.* at p. 15. Line 9 to p. 20, line 25, p. 22, line 8 to p. 24, line 4). Similarly when questioned about the Software Pool Agreement, Plunkett refused to answer. Had he answered truthfully his testimony would support the finding that the agreement was a sham transaction; it was nothing more than a device to inflate Lucent's revenues. (*Id.* at p. 24, line 5 to p. 26, line 18).[51]

144. Independent evidence shows that Plunkett was involved in the June 2000 end of quarter deal. *See, e.g.,* PX 360 (Ackerman's June 23, 2000 email to Kantor) ("He [Plunkett] wants us to agree to another $53M in purchases for 2Q (that includes $17M of accelerated pay as you grow for 5ESS's")). Independent evidence also proves he was involved in the Septem-

ber 2000 end of quarter deal and the Software Pool Agreement. *See e.g.,* PX 125 (Plunkett's September 29, 2000 letter to Ackerman): "Winstar Agrees [sic] to purchase from Lucent the following ... $18,852,500 5ESS PAYG" and PX 127 (Ackerman's September 18, 2000 email to Kantor): "I just spoke with Bill [Plunkett]. He informed me that you and Nina had met (dinner?) And you agreed to help them get to the number they need this quarter...something around $110M, of which we have already spent about $45M. There is not much I can give them that we really need, but there are some creative things I can do that can get us close to their number without being totally stupid."

145. Harris was asked virtually the same questions and also invoked her Fifth Amendment privilege. She, like Plunkett, was involved in the transactions about which she was questioned and the Court finds that had she answered truthfully, her testimony would also have been adverse to Lucent. Had Plunkett and Harris answered truthfully about the nature of the relationship between the two companies, they would have acknowledged Lucent's control over Winstar and lack of arms' length relationship between them. *Rad Services v. Aetna Cas. & Surety Co.,* 808 F.2d 271, 280–81 (3d Cir.1986), *quoting Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). *See also Baxter,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810; *LiButti v. U.S.,* 107 F.3d 110 (2d Cir.1997); *Federal Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland,* 45 F.3d 969 (5th Cir.1995); *Davis v. The Mut. Life Ins. Co. of New York,* 6 F.3d 367 (6th Cir.1993), *cert. denied,* 510 U.S. 1193, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994);

---

**51.** Although there is conflicting testimony about the actual value of the goods Winstar was committed to purchases under the Software Pool Agreement, evidence of the value is that it totaled somewhere between $20 and $40 million, significantly less than the $135 million Winstar was to pay.

*Brink's Inc. v. The City of New York*, 717 F.2d 700 (2d Cir.1983).

146. Lucent was an insider of Winstar's on December 7, 2000, the date of the Transfer.

147. Consequently all of the elements of a preference have been satisfied. The payment of the Siemans proceeds was a preference.

148. Lucent argues, however, that even if the Transfer was preferential the Trustee may not recover because Lucent gave subsequent new value to Winstar when it continued to loan under the Second Credit Agreement. Although the amount that it claims it gave in new value is an ever-changing figure in this case, the inability of Lucent to fix the amount is irrelevant as it is not entitled to the benefit of the new value defense.

149. Lucent bears the burden of establishing new value. 11 U.S.C. § 547(g) (the creditor ... against whom recovery or avoidance is sought has the burden of proving the non-avoidability of a transfer under subsection (c) of this section); *Phoenix Restaurant Group, Inc. v. Ajilon Professional Staffing LLC (In re Phoenix Restaurant Group, Inc.)*, 317 B.R. 491, 494 (Bankr.M.D.Tenn.2004).

150. Lucent's new value defense fails for two reasons. First, to the extent Lucent provided any equipment or software to Winstar after December 7, 2000, it did so on a secured basis, as is evidenced by the Security Agreements dated May 9, 2000, and December 22, 2000, (DX–32; DX–33) and as admitted by Lucent in its October 11, 2001, secured proof of claim (PX–340) and the escrow fund stipulations. (PX–506; PX–507; PX–508). Second, even if the additional value were provided on an unsecured basis, Lucent has failed to show that it was provided *after* the receipt by Lucent of the preferential transfer.

151. It is well settled that to support a new value affirmative defense, section 547(c)(4)(A) requires a creditor to establish that, after receiving a preferential payment, the creditor advanced "new value" to the debtor "not secured by an otherwise unavoidable security interest." *New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.)*, 880 F.2d 679, 680 (3d Cir.1989). Lucent provided only secured value: all Lucent equipment and software sold to Winstar was sold subject to two separate security agreements dated May 9, 2000, and December 22, 2000. (DX–32, DX–33); Lucent's proof of claim (PX–340) alleges a secured claim although it provides no evidence of the value of its collateral; the Trustee and Lucent have entered into three stipulations (PX–506, PX–507, and PX–508) which recognize the validity of Lucent's security interests and provide for distribution to Lucent of the proceeds of the sale of Winstar assets that were subject to Lucent's lien (subject to judgment on the Trustee's equitable subordination claim).

152. For the foregoing reasons the Trustee is awarded judgment in the amount of $188,180,000.

## COUNT XI: EQUITABLE SUBORDINATION

153. The Bankruptcy Code invests the Court with authority to subordinate all or part of a claim "under the principles of equitable subordination...." 11 U.S.C. § 510(c). Courts considering equitable subordination follow the *Mobile Steel* test: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with

the Bankruptcy Code. *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir.1977). *See also Merrimac Paper Co. v. Harrison (In re Merrimac Paper Co.)*, 420 F.3d 53, 58 (1st Cir.2005); *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986 (3d Cir.1998).

■ 154. When the creditor is an insider, the proof required to prove equitable subordination is not demanding. In such cases, a bankruptcy trustee need only show "material evidence" of unfair conduct. *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir.1986); *see also In re Epic Capital Corp., et. al.*, 290 B.R. 514, 524 (Bankr.D.Del.2003), *aff'd*, 307 B.R. 767 (D.Del.2004).

■ 155. "For non-insider claimants, egregious conduct must be established to justify equitable subordination...." *In re Mid–American Waste Systems, Inc.*, 284 B.R. 53, 70 (Bankr.D.Del.2002) (internal citations omitted). "[The degree of non-insider misconduct] has been variously described as 'very substantial' misconduct involving 'moral turpitude or some breach of duty or some misrepresentation whereby other creditors were deceived to their damage' or as gross misconduct amounting to fraud, overreaching or spoliation." *In re M. Paolella & Sons, Inc.*, 161 B.R. 107, 119 (E.D.Pa.1993), citing *In re Osborne*, 42 B.R. 988, 996 (W.D.Wis.1984).

156. Nevertheless the test is the same; only the standard of proof required differs. *Mid–American Waste Systems*, 284 B.R. at 70 (internal citations omitted).

### Inequitable Conduct

■ 157. There are three generally recognized categories of misconduct which may constitute inequitable conduct for insiders: "(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere Instrumentality or alter ego." *Id.*

158. The same facts underlying the finding that Lucent was an insider of Winstar warrant a finding that Lucent engaged in inequitable conduct by using Winstar as a mere instrumentality to inflate Lucent's own revenues.

159. Yet whether Lucent is an insider or not does not affect the outcome of the Court's conclusion that the first prong of the *Mobile Steel* test is satisfied: the facts in this case warrant equitably subordinating Lucent's claim because it was egregious. Lucent repeatedly threatened Winstar with nonpayment after Wireless performed significant services under the subcontract, all in an effort to extract more and more from Winstar, Lucent's captive purchaser. Ultimately, when Lucent's new management regime determined that a refinancing notice, the equivalent of a financial death knell for Winstar, had to be sent, Lucent deliberately held up the refinancing notice to ensure that the Siemans refinancing occurred and new equity was infused into the dying Winstar.

### Harm to Winstar's creditors

■ 160. Lucent's conduct resulted in substantial damages to Winstar and ultimately Winstar's creditors, including, apart from the preferential payment itself, the interest paid by Winstar to Lucent on unnecessary Lucent equipment and services purchased by Winstar to generate revenue for Lucent, storage costs, and insurance costs. Winstar sustained additional damages in that the approximate $244 million (on a cost adjusted basis) of Lucent equipment in inventory in warehouses on March 31, 2001 was sold in December 2001 for approximately a penny on the dollar compared to its December 7, 2000, balance sheet stated value.

161. In addition Winstar received $270 million in equity financing on December 7, 2000 through the issuance of Series H Preferred Stock. The funding came primarily from Welch Carson Anderson & Stowe and Credit Suisse First Boston Private Equity. (DX 701 at 26 and 48).

162. The Debtors and their creditors were harmed by Lucent's deliberate delay in sending the refinancing notice. Lucent intentionally waited until it had received the proceeds of the Siemans refinancing before allowing the public to learn what it already knew; Winstar was in significant financial distress and indeed, as set forth above, was insolvent. Lucent reaped a substantial benefit but at the expense of the Debtors' other creditors.

### Consistent with the Bankruptcy Code

163. Subordinating Lucent's claims is not inconsistent with the Bankruptcy Code.

164. Consequently Lucent's claim will be subordinated under section 510(c) of the Bankruptcy Code to the claims of *all* creditors, including all unsecured claims which includes the deficiency claim of Siemans, if any, and to the interests of those entities who infused the $270 million of equity in Winstar on December 7, 2000. The lien of Lucent is preserved for the benefit of the estate and is transferred to the Trustee in her representative capacity.

### LUCENT'S COUNTERCLAIMS

165. Lucent seeks damages from Winstar's estate on the basis of fraud and negligent misrepresentation arising from Winstar's representation implicit in at least four borrowing representations from and after January 18, 2001 that it was in compliance with the CAPEX covenant.

166. "Under Delaware law, express choice of law provisions in contracts are generally given effect." *Harper v. De-laware Valley Broadcasters, Inc.*, 743 F.Supp. 1076 (D.Del.1990).

167. Lucent must establish each of the following elements: (1) a material misrepresentation or omission of fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; (4) reasonable reliance on the representation; and (5) resulting damages. *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir.1997); *see also Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 784–85 (2d Cir.2003). Each must be proved by clear and convincing evidence. *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 784–85 (2d Cir.2003).

168. Lucent has not proved that Winstar breached the CAPEX covenant and if it did so, it did so knowingly. Winstar's employees testified that they believed that the company was in compliance with the CAPEX covenant in the first quarter of 2001. To the extent that Winstar was not in compliance with the CAPEX covenant, this "breach" is harmless. Lucent was well aware of Winstar's financial status and some of its employees were even involved in attempting to help Winstar lower its CAPEX in order to comply with the covenant.

169. Lucent has not demonstrated, and given the level of its knowledge and involvement cannot demonstrate, that it reasonably relied upon Winstar's representations. Lucent itself knew of Winstar's deteriorating financial condition in November and December 2000. Lucent was prepared to issue the refinancing notice as soon as it got the Siemans proceeds. For it now to argue it was duped by the Debtor is disingenuous.

170. To establish a claim of negligent misrepresentation, the claimant must prove by a preponderance of the evidence: (1) carelessness in imparting

words; (2) upon which others were expected to rely; (3) and upon which others acted or failed to act; (4) to their damage; and (5) the declarant must express the words directly to one to whom it is bound by some relation or owes a special duty of care (which must involve a "closer degree of trust" than that of an ordinary buyer and seller). *Dallas Aero., Inc.*, 352 F.3d at 788; *see also Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir.2000). It must also demonstrate that its reliance on Winstar's purportedly false statements was "reasonable." *Morrissey v. GMC*, 21 Fed.Appx. 70, 73 (2d Cir.2001).

171. As set above, Lucent has not met its burden. It cannot ignore its own knowledge and feign surprise to learn the CAPEX covenant was breached when it was deeply immersed in the financial transactions of Winstar. Therefore judgment will enter for Winstar with respect to Lucent's counterclaims.

## CONCLUSION

For the foregoing reasons, the Court finds that judgment should enter for the Plaintiff on all counts and counterclaims as set forth above.

A separate order of judgment for the Plaintiff will enter.